1  Stephen M. Doniger (SBN 179314)
   stephen@donigerlawfirm.com
2  Benjamin F. Tookey (SBN 330508)
   btookey@donigerlawfirm.com
3  DONIGER / BURROUGHS
4  603 Rose Avenue
   Venice, California 90291
5  Telephone: (310) 590-1820
6  Attorneys for Plaintiff

7
           **UNITED STATES DISTRICT COURT**
8          **CENTRAL DISTRICT OF CALIFORNIA**

9
   BRANDON VOGTS,                       Case No. 2:22-cv-01153-FWS-PVC
10                                       _Hon. Fred W. Slaughter Presiding_
          Plaintiff,
11                                       **PLAINTIFF'S MOTION FOR**
12  v.                                   **PARTIAL SUMMARY**
                                         **JUDGMENT**
13
   PENSKE MEDIA CORPORATION;             **[Separate Statement of Undisputed**
14  DIRT.COM, LLC; et al.,               **Material Facts, Memorandum of**
                                         **Point and Authorities, Declarations,**
15                                       **and [Proposed] Order submitted**
          Defendants.                    **concurrently]**
16
17
18                                       Date:       April 27, 2023
19                                       Time:       10:00 a.m.
                                         Courtroom:  10D
20
21

22        TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

23        PLEASE TAKE NOTICE THAT at 10:00 a.m. on April 27, 2023 in this

24  Court (or as soon thereafter as this Court may hear this matter), Plaintiff Brandon

25  Vogts will and hereby does move for partial summary judgment establishing that

26  Defendants Penske Media Corporation ("PMC") and Dirt.com, LLC ("Dirt")

27  (collectively, the "PMC Defendants") are liable for direct copyright infringement

28  of Vogts' copyrights in the 53 photos asserted in this case (collectively, the

"Subject Photographs," *see* Dkt. 1 ¶ 22, Dkt. 1-1) as a matter of law.

This motion is made on the grounds that there are no genuine disputes of material fact that: (1) Vogts' owns valid copyrights in the Subject Photographs; (2) the PMC Defendants' accessed and copied the Subject Photographs; and (3) the PMC Defendants have no viable affirmative defenses for direct copyright infringement.

This motion based on the below memorandum of points and authorities, the accompanying separate statement of undisputed material facts and declarations, the record in this case, and such further and other evidence and argument as may be received at the hearing.

This motion is made following conferences of counsel pursuant to Civil L.R. 7-3, which took place beginning on December 29, 2022 and culminated on February 22, 2023.


                                            Respectfully submitted,

Dated: March 9 2023            By:    */s/ Stephen M. Doniger*
                                            Stephen M. Doniger, Esq.
                                            Benjamin F. Tookey, Esq.
                                            DONIGER / BURROUGHS
                                            Attorneys for Plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................- 1 -

II.     STATEMENT OF FACTS .......................................................................- 2 -

   A.   Brandon Vogts, his photos, and his business. .........................................- 2 -

   B.   PMC, its business, and its brands, including Dirt. ..................................- 3 -

   C.   The PMC Defendants' unauthorized copying, display, and distribution of
the Subject Photographs. ..............................................................................- 4 -

   D.   The PMC Defendants' additional unauthorized uses of the Subject
Photographs in newsletters, social media posts, and syndicated content. .........- 6 -

III.    ARGUMENT .........................................................................................- 7 -

   A.   The PMC Defendants are liable for direct copyright infringement because
Vogts owns valid copyrights in, and the PMC Defendants accessed and copied,
the Subject Photographs. ..............................................................................- 8 -

     1.   Vogts owns valid copyrights in the Subject Photographs........................- 8 -

     2.   The PMC Defendants copied, displayed, and distributed the Subject
Photographs without a license, authorization, or consent from Vogts. ..........- 8 -

   B.   The PMC Defendants' fair use defense fails as a matter of law. ...........- 10 -

     1.   The PMC Defendants' commercial uses of the Subject Photographs were
non-transformative. ....................................................................................- 12 -

     2.   The Subject Photographs are original, creative works...........................- 15 -

     3.   The PMC Defendants displayed nearly verbatim reproductions of the
Subject Photographs even though they publish posts on their Website without
photos..........................................................................................................- 16 -

     4.   If universalized, the PMC Defendants' uses would destroy an established
licensing market for the use of property photos in articles discussing those
properties. ...................................................................................................- 18 -

IV.    CONCLUSION .....................................................................................- 21 -

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .................................................................. 9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................. 7

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
  297 F. Supp. 3d 339 (S.D.N.Y. 2017) ...................................................... 13

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F. Supp. 3d 395 (S.D.N.Y. 2016) ...................................................... 13

*Cambridge Univ. Press v. Becker*,
  2010 WL 11507617 (N.D. Ga. Sept. 30, 2010) ...................................... 11

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ........................................................................... Passim

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................. 7

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .................................................................. 19

*Dr. Seuss Enters., LP v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) ................................................................ 16

*Dr. Seuss Enters., L.P. v. ComicMix LLC.*,
  983 F.3d 443 (9th Cir. 2020) ............................................................. Passim

*Elvis Presley Enterprises, Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) .............................................. 11, 13, 15, 21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) .................................................................................. 8

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1163 (2021) ...................................................................... 10, 12

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985) .......................................................................... 12, 17

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Companies, Inc.*,
  621 F.2d 57 (2d Cir. 1980) ..................................................................... 13

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) .................................................................. 16

*L.A. News Serv. v. KCAL-TV Channel 9*,
  108 F.3d 1119 (9th Cir. 1997) ......................................................... Passim

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008) .................................................................. 19

*Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*,
  2018 WL 5310831 (N.D. Cal. June 29, 2018) ......................................... 9

iv

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................... 8
*Mattel, Inc. v. Walking Mountain*,
    353 F.3d 792 (9th Cir. 2003) ........................................ 10, 12
*McGucken v. Newsweek LLC*,
    464 F. Supp. 3d 594 (S.D.N.Y. 2020) ................................. 21
*McGucken v. Pub Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022) ....................................Passim
*Monge v. Maya Mags., Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ....................................Passim
*Otto v. Hearst Commc'ns, Inc.*,
    345 F. Supp. 3d 412 (S.D.N.Y. 2018) ................................. 13
*Sandoval v. New Line Cinema Corp.*,
    973 F. Supp. 409 (S.D.N.Y. 1997) ...................................... 11
*Selle v. Gibb*,
    741 F.2d 896 (7th Cir. 1984) .............................................. 9
*Sicre de Fontbrune v. Wofsy*,
    39 F.4th 1214 (9th Cir. 2022) ..................................... 15, 19
*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) .............................................. 9
*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017) ........................................... 8, 9
*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ................................... 9, 16, 20
*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir.1989) ............................................. 19
*Werner v. Red Blue Media Inc.*,
    2021 WL 3560588 (C.D. Cal. Aug. 9, 2021) ...................Passim
*Worldwide Church of God v. Phila. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ..................................... 17, 19
*Zivkovic v. S. California Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) .......................................... 10

**Statutes**

17 U.S.C. § 106 ................................................................ 8, 9
17 U.S.C. § 107 ................................................................... 11
17 U.S.C. § 107(1) .............................................................. 12
17 U.S.C. § 107(2) .............................................................. 16
17 U.S.C. § 107(3) .............................................................. 17
17 U.S.C. § 107(4) .............................................................. 18
17 U.S.C. § 410(c) ................................................................ 8

**Rules**

Fed. R. Civ. P. 56...................................................................................... 7

**Other Authorities**

L.R. 7-3 ................................................................................................... 2
L.R. 11-6.2.............................................................................................. 22

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1

**MEMORANDUM OF POINT AND AUTHORITIES**

2

## I.   INTRODUCTION

3       As the saying goes, a picture is worth a thousand words. One powerful photo

4  can drive interest in a story that may otherwise go unnoticed. There is a vibrant

5  licensing market for photographs for use in articles, books, advertisements, and

6  more because copyright law does not allow infringers "to avoid the drudgery in

7  working up something fresh" by exploiting the value of a photo they did not

8  create. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). Yet that

9  is exactly what the PMC Defendants did with Vogts' original photographs.

10      Vogts, a professional photographer, captured a series of photos of three

11  different homes (i.e., the Subject Photographs). Although Vogts has previously

12  licensed property photos to other media publications for use in online articles

13  discussing those properties, the PMC Defendants used the Subject Photographs—

14  without seeking or obtaining Vogts' permission—in posts on the PMC Defendants'

15  Website (defined below), in social media posts, and in posts that PMC syndicated

16  to *Variety* (a PMC publication) and third-party syndication partners.

17      There is no dispute that Vogts owns valid copyrights in the Subject

18  Photographs, that the PMC Defendants accessed and copied those Photographs

19  without permission, and that those unauthorized uses do not qualify as fair use.

20  Indeed, none of the four fair use factors weigh in favor of the PMC Defendants.

21  The PMC Defendants used the Subject Photographs for commercial purposes

22  without critiquing or commenting on Vogts or those Photographs. Rather, the PMC

23  Defendants used those Photographs for the exact purpose for which they were

24  created—i.e., to depict the properties. The Subject Photographs are original,

25  creative works, and the PMC Defendants copied them in their entirety—other than

26  cropping out watermarks. And because the PMC Defendants used the Subject

27  Photographs in the same manner as other media publications that have sought and

28  obtained permission from Vogts to use his photos in online articles, their taking

1 represents an existential threat to Vogts' ability to license, and control the licensing

2 of, his works. As a matter of law, the PMC Defendants have no fair use defense.

3    The Ninth Circuit's recent holding in *McGucken v. Pub Ocean Ltd.*, 42 F.4th

4 1149 (9th Cir. 2022) reinforces that conclusion. If fair use applied here, it is hard to

5 imagine what unauthorized uses of copyrighted works would *not* be fair use. Any

6 copyrighted work, when placed in a compilation that may expand its context,

7 would be a fair use. Any song would become a fair use when part of a playlist. A

8 book about Los Angeles could freely use any photographer's photos of Los

9 Angeles. That is not the law because it in no way "further[s] . . . the goal of

10 copyright, to promote science and the arts." *Campbell*, 510 U.S. at 579. Instead,

11 what furthers that goal is rewarding artists for creating new and compelling works,

12 and protecting their ability to make a living from that creativity.

13    Therefore, Vogts respectfully requests that this Court find the PMC

14 Defendants liable for infringing his copyrights in the Subject Photographs.

15 **II. STATEMENT OF FACTS**

16  **A. Brandon Vogts, his photos, and his business.**

17    Brandon Vogts is a professional photographer specializing in residential and

18 commercial interiors, luxury real estate, and architecture. Separate Statement of

19 Undisputed Material Facts ("SSUMF") ¶ 2. His photos have been featured in

20 numerous publications and media outlets. *Id*. ¶ 3.

21    Vogts' clients receive a license for limited authorized uses of his photos, and

22 any use of those photos beyond the original scope of the granted license requires

23 additional permission by Vogts. *Id*. ¶¶ 4-5, 7. In other instances where Vogts has

24 authorized his clients to use his photos in connection with the sale of a property, he

25 has subsequently provided separate licenses to media publications to use those

26 photos in articles about those properties. *Id*. ¶¶ 6, 10. For example, Vogts received

27 requests from *Redfin* (redfin.com), *Zillow*, *Daily Mail*, and the *Wall Street Journal*

28 seeking permission to use his photos of properties owned by entertainers Kathy

1  Griffin and Neil Patrick Harris in articles that discussed those properties. *Id*. ¶ 8.

2  Among other things, those licenses required that he be provided photo credits in all

3  versions of the articles that were published, and that the narratives of the articles

4  were not adverse to his clients. *Id*. ¶ 9.

5         Vogts took and owns the Subject Photographs, which are registered with the

6  U.S. Copyright Office. *Id*. ¶¶ 11-13. He authorized certain of his real estate agent

7  clients to use those Subject Photographs for the limited purpose of marketing the

8  properties depicted therein for lease, sale, or purchase. *Id*. ¶¶ 14-15. The PMC

9  Defendants then accessed and copied the Subject Photographs from the licensed

10  listings and displayed them in posts about, and galleries showing, the properties—

11  all without seeking or obtaining Vogts' permission. *Id*. ¶¶ 15-17.

12  **B. PMC, its business, and its brands, including Dirt.**

13        PMC is one of the largest digital media and publishing companies in the

14  world. *Id*. ¶ 20. In 2014, it launched "Dirt, a new section focused on high-end digs"

15  in *Variety*—which PMC owns and publishes—as "a fun and juicy read, meant to

16  entertain above all else." *Id*. ¶ 21. Between 2014-18, PMC saw that the page views

17  for *Variety*'s Dirt column "were good" and decided to spinoff the column into a

18  website to better "monetize it," as page views generate revenue for PMC. *Id*. ¶¶ 26-

19  27. Thus, PMC made Dirt its wholly owned subsidiary and added "Dirt.com" to its

20  portfolio of "brands." *Id*. ¶ 28.

21        The PMC Defendants own, operate, and control the website dirt.com and its

22  related/affiliated subdomains, mobile websites, and applications (collectively, the

23  "PMC Defendants' Website"). *Id*. ¶ 30. The PMC Defendants' Website is

24  commercial and features real estate-related content. *Id*. ¶ 31. The PMC

25  Defendants' Website, including the posts on the PMC Defendants' Website

26  displaying the Subject Photographs, generates revenue from page views,

27  advertisements (including "sponsored links"), and syndication. *Id*. ¶¶ 32-36.

28

1    The PMC Defendants' Website is run through and powered by, and the posts
2    that appear on the PMC Defendants' Website are created in and published from,
3    WordPress. *Id.* ¶ 37. The PMC Defendants "run articles with no pictures" on their
4    Website. *Id.* ¶ 38. The posts that do use photos, though—as was the case here—are
5    made up of two "sides"—a "text side," and an "image side" (or "gallery")—which
6    are separately created and published in WordPress. *Id.* ¶ 39.

7    When a gallery is created and published, it has its own title, date and time
8    stamp, and web address that is distinct from the "text side" it is linked to; each of
9    the photos displayed in the gallery has its own web address; and each web address
10   generates revenue when viewed. *Id.* ¶¶ 40-41. There is no text in the gallery. *Id.* ¶
11   42. Instead, in the gallery, a user can zoom in on the photos and make them larger,
12   as the photos displayed therein are high-resolution. *Id.* ¶ 43.

13   The "text side" of the posts on the PMC Defendants' Website starts with a
14   "header photo" that includes an inset headshot of the individual discussed in the
15   post superimposed over a "feature image" of the property discussed in the post. *Id.*
16   ¶ 46. The PMC Defendants obtain those inset headshots from Getty Images and are
17   authorized to use those inset headshots pursuant to a license agreement between
18   PMC and Getty.[1] *Id.* ¶¶ 47-49.

19   **C. The PMC Defendants' unauthorized copying, display, and distribution**
20   **of the Subject Photographs.**

21   The PMC Defendants have previously sought and obtained permission to
22   use photos in articles "reporting on the property depicted in the photograph[s]" on
23   the condition that a photo credit be attached. *Id.* ¶ 96. Here, however, they neither
24   sought nor received any permission.

25

26

27   [1] Prior to PMC's agreement with Getty Images, PMC had an agreement with
28   Associated Press that was essentially the same. *Id.* ¶ 50.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On August 7, 2020, Mark Voss, real estate editor for the PMC Defendants'
Website, copied Subject Photographs 1-20 (*see* Dkt. 1-1) from realtor.com by
right-clicking on them, saving them, cropping out MLS watermarks from the
bottom righthand corners, changing their file names, and then uploading them to
the PMC Defendants' media servers. *Id*. ¶¶ 53-54. At 12:24 p.m. that same day,
Mr. Voss published a gallery of Subject Photographs 1-20 on the PMC
Defendants' Website and titled the gallery "'Scandal' Star Darby Stanchfield
Sheds Glendale Home." *Id*. ¶ 55. Then at 12:45 p.m., he published the text side
(i.e., an article) linked to that gallery and titled the text side "Darby Stanchfield
Sells Secluded Glendale Traditional." *Id*. ¶ 56.

Just over a month later, on September 15, 2020, Mr. Voss copied Subject
Photographs 21-38 from redfin.com in the same manner. *Id*. ¶¶ 57-58. At 4:52 p.m.
that day, Mr. Voss published a gallery of Subject Photographs 21-38 on the PMC
Defendants' Website and titled the gallery "Look Around Chris O'Dowd's L.A.
Bungalow." *Id*. ¶ 59. Then at 4:55 p.m., he published a text side linked to that
gallery and titled the text side "Chris O'Dowd, Dawn O'Porter List Melrose
District Bungalow." *Id*. ¶ 60.

On or about March 10, 2021, James McClain, editor at large for the PMC
Defendants' Website, copied Subject Photographs 39-53 from redfin.com in the
same manner as set forth above. *Id*. ¶¶ 61-62. That same day he published a gallery
of Subject Photographs 39-53 on the PMC Defendants' Website, and then
published a text side linked to that gallery and titled the text side "Robin Williams'
Son Zak Buys French Country-Inspired L.A. Villa." *Id*. ¶¶ 63-64.

Each of the above-referenced posts on the PMC Defendants' Website
displaying the Subject Photographs consisted of a "text side" and a gallery, each of
which was created and published separately. *Id*. ¶¶ 44-45. Subject Photographs 1,
32, and 40 were the "feature images" used in the "header photos" in the text sides
of the posts on the PMC Defendants' Website that displayed the Subject

Photographs. *Id*. ¶ 51. Dirt licensed the inset headshots of the individuals that were discussed in the text sides of those posts—which were superimposed over the "feature images" of Subject Photographs 1, 32, and 40—from Associated Press. *Id*. ¶ 52. The Subject Photographs were displayed in the galleries and header photos "for people to look at" as "a visual representation of . . . some of the things we've talked about in the article[s]." *Id*. ¶ 65. Interestingly, the text sides of the August and September 2020 posts linked to other articles from the PMC Defendants' Website that displayed no photos. *Id*. ¶¶ 66-67.

**D. The PMC Defendants' additional unauthorized uses of the Subject Photographs in newsletters, social media posts, and syndicated content.**

Posts from the PMC Defendants' Website that perform well and attract users are promoted in Dirt newsletters. *Id*. ¶ 69, 71. Those newsletters—which contain the header photos from, and links to, the promoted posts—are distributed via email to the subscribers of the PMC Defendants' Website. *Id*. ¶¶ 70-71, 73.

Each of the posts displaying the Subject Photographs were also promoted in Dirt newsletters—on August 11, 2020, September 18, 2020, and March 12, 2021. *Id*. ¶¶ 74-75. Those newsletters displayed Subject Photographs 1, 32, and 40, respectively (i.e., the header photos from the posts displaying the Subject Photographs), and were distributed via email to the subscribers of the PMC Defendants' Website. *Id*. ¶¶ 76-79.

In addition, the PMC Defendants promote popular posts on Dirt's social media channels. *Id*. ¶¶ 80, 83. Like the newsletters, the social media posts contain the header photos from, and links to, posts on the PMC Defendants' Website that performed well and attracted users. *Id*. ¶¶ 81-82. In this case, the post displaying Subject Photographs 39-53 was also promoted on Dirt's Twitter and Facebook pages on March 12, 2021, with those social media posts displaying a copy of Subject Photograph 40 (i.e., the header photo). *Id*. ¶ 84.

1    Finally, PMC syndicates content from the PMC Defendants' Website to

2  other brands within PMC's portfolio as well as PMC's third-party syndication

3  partners pursuant to revenue-share agreements. *Id*. ¶¶ 85-86, 88-89. Those

4  agreements contain limitations on the distribution of photos. *Id*. ¶ 89. Importantly,

5  the PMC Defendants have not syndicated content when the owner of the photos

6  displayed in connection with that content "didn't want it there." *Id*. ¶ 90. In this

7  case, PMC distributed the posts displaying the Subject Photographs to *Variety* and

8  PMC's third-party syndication partners Yahoo, Newsbreak, and Microsoft. *Id*. ¶¶

9  91-94.

10    None of the PMC Defendants' uses of the Subject Photographs (i.e., posts on

11  the PMC Defendants' Website, newsletters, social media posts, and syndicated

12  copies of the posts on the PMC Defendants' Website) credited or otherwise

13  identified Vogts as the source of the Subject Photographs, mentioned Vogts or the

14  Subject Photographs, treated Vogts himself or the Subject Photographs themselves

15  as the story, or commented on or critiqued Vogts himself or the Subject

16  Photographs themselves. *Id*. ¶ 95.

17  **III.    ARGUMENT**

18    "The court shall grant summary judgment if the movant shows that there is

19  no genuine dispute as to any material fact and the movant is entitled to judgment as

20  a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

21  242, 248 (1986). The moving party bears the initial burden of making that

22  showing. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-

23  moving party has the burden of proof at trial, the movant can satisfy its initial

24  burden by demonstrating an absence of evidence to support the non-moving party's

25  case. *Id*. at 325. The non-moving party "must set forth specific facts showing that

26  there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. "Where the record

27  taken as a whole could not lead a rational trier of fact to find for the nonmoving

28

party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, Vogts owns valid copyrights in the Subject Photographs, the PMC Defendants accessed and copied the Subject Photographs, and the PMC Defendants have no viable affirmative defenses to direct copyright infringement. Therefore, this Court should find the PMC Defendants liable for direct infringement of Vogts' copyrights in the Subject Photographs as a matter of law.

**A. The PMC Defendants are liable for direct copyright infringement because Vogts owns valid copyrights in, and the PMC Defendants accessed and copied, the Subject Photographs.**

A copyright holder establishes a prima facie case of direct copyright infringement by showing (1) ownership of a valid copyright in the allegedly infringed material, and (2) copying of that material in violation of the rights enumerated in 17 U.S.C. § 106. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Here, the PMC Defendants are prima facie liable for infringing Vogts' copyrights in the Subject Photographs. *See* Dkt. 42 ¶¶ 1-3.

**1. Vogts owns valid copyrights in the Subject Photographs.**

Vogts took and owns the Subject Photographs, which are registered with the U.S. Copyright Office. *See supra*, Section II.A. That registration further creates a presumption of copyright ownership and validity. *See Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 988 (9th Cir. 2017); 17 U.S.C. § 410(c). There is thus no genuine dispute as to Vogts' ownership of valid copyrights in the Subject Photographs. *See* Dkt. 42 ¶ 1.

**2. The PMC Defendants copied, displayed, and distributed the Subject Photographs without a license, authorization, or consent from Vogts.**

The second element of a copyright infringement claim is satisfied when there is "copying" of a protected work. *Unicolors*, 853 F.3d at 845. The word "copying" is shorthand for infringing any of the copyright owner's exclusive rights

1   enumerated in 17 U.S.C. § 106. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d

2   1004, 1013 (9th Cir. 2001). Copying can be proven either through "direct

3   evidence"; or through "circumstantial evidence" that (1) the defendant had access

4   to the copyrighted work prior to the creation of defendant's work, and (2) there is

5   substantial similarity of the general ideas and expression between the copyrighted

6   work and the defendant's work. *See Three Boys Music Corp. v. Bolton*, 212 F.3d

7   477, 486 (9th Cir. 2000).

8          Here, there is no dispute that the PMC Defendants accessed, copied,

9   displayed, and distributed Vogts' Subject Photographs without seeking or

10  obtaining permission from Vogts. *See supra*, Sections II.C-D. There is no genuine

11  dispute that those copies are essentially (but for minor cropping) verbatim

12  reproductions of the Subject Photographs (*see id*.), and thus by definition are

13  strikingly similar to the Subject Photographs. *See Selle v. Gibb*, 741 F.2d 896, 904

14  (7th Cir. 1984) ("striking similarity" means similarities that "are of a kind that can

15  only be explained by copying, rather than by coincidence, independent creation, or

16  prior common source"). And there is no dispute that the PMC Defendants'

17  unauthorized copying, display, and distribution is "conduct that can reasonably be

18  described as the direct cause of the infringement." *See VHT, Inc. v. Zillow Grp.,

19  Inc.*, 918 F.3d 723, 731 (9th Cir. 2019).

20         Where "the works are so overwhelmingly similar that the possibility of

21  independent creation is precluded," the court may grant summary judgment for a

22  plaintiff on the issue of copying. *Unicolors*, 853 F.3d at 987-88. Because copying

23  is undisputed here (*see* Dkt. 42 ¶¶ 2-3), this element is satisfied. *See Lucasfilm Ltd.

24  LLC v. Ren Ventures Ltd.*, No. 17-CV-07249-RS, 2018 WL 5310831, at *2 (N.D.

25  Cal. June 29, 2018) (finding plaintiff stated a prima facie case for copyright

26  infringement where defendant used images and dialogue at least strikingly similar

27  to plaintiff's protected works, and defendant did not deny their social media pages

28  included images and dialogue from those works).

*   *   *

For the foregoing reasons, the PMC Defendants are prima facie liable for direct copyright infringement. And as set forth below, the PMC Defendants have no viable affirmative defenses.

**B. The PMC Defendants' fair use defense fails as a matter of law.**

The PMC Defendants assert four affirmative defenses to Vogts' direct copyright infringement claim in their Answer: failure to state a claim, license, fair use, and no underlying infringement. *see* Dkt. 22 at 9 of 12. They withdrew their license affirmative defense. *See* SSUMF ¶ 99. And "failure to state a claim" and "no underlying infringement" are not affirmative defenses. *See Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."). Consequently, because the PMC Defendants' first, second, and fourth affirmative defenses should be summarily disposed of (*see BackGrid USA*, Case No. 2:21-cv-06543-FWS-SK, Dkt. 47 at 20-21), the only remaining asserted affirmative defense to direct copyright infringement is fair use. Fair use is a mixed question of law and fact. *See Google*, 141 S. Ct. at 1199. Where, as here, the only dispute is over the legal significance to be drawn from the facts, it is appropriate to adjudicate a fair use defense on summary judgment. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003); *Dr. Seuss*, 983 F.3d at 461.

In determining fair use, Courts analyze the following non-exhaustive factors:[2] (1) the purpose and character of the use, including whether such use is of

---

[2] Whether or not the PMC Defendants acted in "good faith" is irrelevant to the fair use analysis. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) ("Despite its claim that it purchased the photos in good faith, 'the innocent intent of the defendant constitutes no defense to liability.'"). That said, should the PMC Defendants argue "good faith" in their opposition, Vogts reserves his right to address that argument in his reply.

a commercial nature; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These factors are analyzed and weighed "in light of the purposes of copyright." *Dr. Seuss*, 983 F.3d at 451 (quoting *Campbell*, 510 U.S. at 578). The PMC Defendants bear the burden of proof on each factor. *Id.* at 459.[3]

The PMC Defendants cannot meet their burden. Their commercial uses of the Subject Photographs were non-transformative, and the Subject Photographs are precisely the type of original, creative works that serve as the backbone for the well-established photography licensing market. Indeed, the PMC Defendants admitted they do not use photos in all posts on their Website, have previously sought permission to use photos of properties in posts discussing those properties, and subscribe to services like Getty Images and Associated Press to lawfully access and use their library of photos (i.e., the inset headshots). As a result, the PMC Defendants' unauthorized copying, display, and distribution of the Subject Photographs was in no way fair.

---

[3] Moreover, the PMC Defendants must show that *each* of their multiple secondary uses of the Subject Photographs constitutes fair use. *See Sandoval v. New Line Cinema Corp.*, 973 F. Supp. 409, 412 (S.D.N.Y. 1997) ("The defendant bears the burden of proof . . . concerning whether a particular use of a copyrighted work is a 'fair use'"); *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (analyzing each use); *Cambridge Univ. Press v. Becker*, No. 1:08-CV-1425, 2010 WL 11507617, at *13 (N.D. Ga. Sept. 30, 2010) ("Defendants will have the burden of showing that each specified instance of 2009 Copyright Policy infringement was a fair use.").

1

2

**1.  The PMC Defendants' commercial uses of the Subject Photographs were non-transformative.**

3

4

5

6

The PMC Defendants displayed the Subject Photographs in for-profit posts on their Website and beyond as illustrations and visual representations of properties—exactly the purpose for which those Photographs were created. Those commercial uses are non-transformative, weighing heavily against fair use.

7

8

9

10

11

12

13

14

15

16

17

18

The first fair use factor examines "the purpose and character of the use." 17 U.S.C. § 107(1). Under this factor, courts consider whether the new work is transformative and commercial. *See Dr. Seuss*, 983 F.3d at 451–52. For-profit articles are commercial uses. *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 561-62 (1985) (a use is commercial when "the user stands to profit from exploitation of the copyrighted material without paying the customary price"); *Monge*, 688 F.3d at 1176 ("[C]ommercial use is a factor that tends to weigh against a finding of fair use[.]"). Because there is no genuine dispute that the PMC Defendants' uses of the Subject Photographs were commercial (*see supra*, Section II.B), the only inquiry is whether "the new work is transformative and does not simply supplant the original." *Mattel,* 353 F.3d at 800; *Campbell*, 510 U.S. at 579.

19

20

21

22

23

24

25

26

27

"[D]etermining whether and to what extent the new work is transformative" is the "central purpose of the first-factor inquiry," and it "influences" the third and fourth factors. *Dr. Seuss*, 983 F.3d at 451–52. "[T]he word 'transformative' . . . describe[s] a copying use that adds something new and important." *Google*, 141 S. Ct. at 1203. The "benchmarks" of transformative use are "(1) further purpose or different character in the defendant's work, i.e., the creation of new information, new aesthetic, new insights and understanding; (2) new expression, meaning, or message in the original work, i.e., the addition of value to the original; and (3) the use of quoted matter as raw material, instead of repackaging it and merely

28

superseding the objects of the original creation." *Dr. Seuss*, 983 F.3d at 453; *Monge*, 688 F.3d at 1175; *Campbell*, 510 U.S. at 579-80.

In the Ninth Circuit, using a copyrighted work as a "clear, visual recording" of the infringing work's subject is not transformative. *Monge*, 688 F.3d at 1174 (quoting *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997)); *McGucken*, 42 F.4th at 1158. That is, when a copyrighted work is used simply to illustrate what that work already depicts, there is no "further purpose or different character." *Campbell*, 510 U.S. at 579; *see Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (online article not transformative where photos were used as "illustrative aids" depicting subjects described in article). Doing so is merely freeriding on the inherent value of original works. *McGucken*, 42 F.4th at 1158.[4] Indeed, that is why even "[n]ewsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406 n.6 (S.D.N.Y. 2016).[5] "A defendant's use of a copyrighted image in news reporting will generally not tip the first factor in favor of fair use where the image simply

---

[4] *See also Elvis Presley Enters.*, 349 F.3d at 629 (using video clips of musical performances for "intrinsic entertainment value" not transformative); *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 433 (S.D.N.Y. 2018) (not transformative for "a news publisher to poach an image from an individual's social media account for an article that does little more than describe the setting of the image").

[5] *See also Monge,* 688 F.3d at 1183 ("Waving the news reporting flag is not a get out of jail free card in the copyright arena."); *Iowa State Univ. Research Found., Inc. v. Am. Broad. Companies, Inc.*, 621 F.2d 57, 61 (2d Cir. 1980) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance.").

illustrates the subject matter of a report." *Werner v. Red Blue Media Inc.*, No. 220CV01024, 2021 WL 3560588, at *3 (C.D. Cal. Aug. 9, 2021).

The PMC Defendants admit that they used the Subject Photographs as "a visual representation of . . . some of the things we've talked about in the article[s]." As a matter of law, that is not transformative. *See McGucken*, 42 F.4th at 1158; *see Monge*, 688 F.3d at 1174 (quoting *KCAL-TV*, 108 F.3d at 1122). The Subject Photographs were displayed in galleries that had *no text*, and even the text sides of the posts—which used Subject Photographs 1, 32, and 40—failed to credit or otherwise identify Vogts as the source of the Subject Photographs, treat Vogts himself or the Subject Photographs themselves as the story, or comment on or critiqued Vogts himself or the Subject Photographs themselves. *See supra*, Section II.C. Instead, the PMC Defendants used the Subject Photographs for exactly the purpose for which they were taken: to depict the properties. That is a far cry from presenting the Subject Photographs in a new or different light. *See McGucken*, 42 F.4th at 1158, 1161 n.4.

To be sure, none of the posts' text sides describe or engage with Vogts—who is never mentioned or identified—or the Subject Photographs themselves. There is, *at most*, a loose topical connection between the written descriptions of the aspects of the properties discussed in the text sides and what is depicted in the Subject Photographs. *See supra*, Section II.C. But "[a]dding informative captions," or embedding photos within the text of articles, in no way "meaningfully transform the photos." *See McGucken*, 42 F.4th at 1158-59.[6] Doing so only amounts to non-transformative visual "filler." *See id.*; *Elvis Presley Enters.*, 349 F.3d at 625.

---

[6] *See also Sicre de Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022); *Monge*, 688 F.3d at 1176 ("wholesale copying sprinkled with written commentary" was "at best minimally transformative"); *Elvis Presley Enters.*, 349 F.3d at 628 ("[V]oice-overs do not necessarily transform a work."); *KCAL-TV*, 108 F.3d at

Numerous Ninth Circuit cases compel the conclusion that the PMC Defendants engaged in non-transformative exploitations of the Subject Photographs without adding anything new. *See McGucken*, 42 F.4th at 1159; *Elvis Presley Enters.*, 349 F.3d at 629. In *Monge*, a gossip magazine did not transform a celebrity's private photos of her secret wedding when it used the photos in an exposé about the wedding. 688 F.3d at 1175–76. Similarly, in *KCAL-TV*, a network did not transform helicopter footage of the violence at Florence and Normandie during the 1992 Los Angeles riots simply by using that footage as part of the network's coverage of the riots. 108 F.3d at 1122. Under *McGucken*, *Monge*, and *KCAL-TV*, the PMC Defendants' uses of the Subject Photographs were non-transformative. *McGucken*, 42 F.4th at 1159; *KCAL-TV*, 108 F.3d at 1122.

Vogts has previously licensed photos of particular properties to media publications for use in articles discussing those properties. *See supra*, Section II.A. The PMC Defendants used the Subject Photographs in the same non-transformative way "without paying the customary price" for commercial purposes, which "cuts against the fair use defense." *See McGucken*, 42 F.4th at 1159, 1161; *Monge,* 688 F.3d at 1176; *Dr. Seuss*, 983 F.3d at 451–52. As a result, this factor weighs against the PMC Defendants.[7] *See Werner v. Red Blue Media Inc.*, No. 220CV01024, 2021 WL 3560588, at *3–4 (C.D. Cal. Aug. 9, 2021).

## 2.  The Subject Photographs are original, creative works.

The second fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). In assessing a copyrighted work's nature, courts consider the

---

1122 ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative.").

[7] This Court recently arrived at the same conclusion in a similar case. *See BackGrid USA, Inc. v. Haute Living Inc., et al.*, Case No. 2:21-cv-06543-FWS-SK (C.D. Cal. Jan. 6, 2023), Dkt. 47 at 15 ("The court accordingly finds Defendant's use of Plaintiff's five copyrighted photographs is not transformative.").

extent to which it is creative and whether it is unpublished. *McGucken*, 42 F.4th at 1161. "[F]air use is more difficult to establish when [creative] works are copied." *Dr. Seuss*, 109 F.3d at 1402. "Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003). And "neither *Harper & Row* nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use." *Dr. Seuss*, 983 F.3d at 456.

Vogts' Subject Photographs are creative because they were the product of Vogts' creative decisions. *See supra*, Section II.A; *see also VHT*, 918 F.3d at 744 (holding that photos of residences were creative because they were "aesthetically and creatively shot and edited by professional photographers"); *McGucken*, 42 F.4th at 1161-62. Thus, the Subject Photographs are "entitled to strong protection, weighing against fair use." *See Werner*, No. 2021 WL 3560588 at *4–5.

And while Vogts' Subject Photographs had been published (with limited authorization) on MLSs (*see supra*, Section II.A), that does not weigh in favor of fair use. *See McGucken*, 42 F.4th at 1162; *Werner*, 2021 WL 3560588 at *4–5 ("Even assuming that the photographs were previously published, that would not necessarily favor fair use. An author does not lose the right to control future publication of the work simply because the work has been published before.").

This weighs against fair use. *See McGucken*, 42 F.4th at 1162; *BackGrid USA*, Case No. 2:21-cv-06543-FWS-SK, Dkt. 47 at 16-17.

**3.  The PMC Defendants displayed nearly verbatim reproductions of the Subject Photographs even though they publish posts on their Website without photos.**

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *See* 17 U.S.C. § 107(3) (emphasis added); *Harper & Row*, 471 U.S. at 565 ("[A] taking may not be excused merely because it is insubstantial with respect to the infringing work."). This inquiry is

concerned with "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. As such, this factor weighs against fair use when the infringer publishes "the heart" of an "individual copyrighted picture" without justification, or when "a substantial portion of the infringing work was copied verbatim from the copyrighted work." *McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1178; *Campbell,* 510 U.S. at 587.

But for minor cropping of watermarks, the PMC Defendants used the entireties of each of the Subject Photographs. Thus, they necessarily took "the heart" of each of the Subject Photographs, as the extent of the PMC Defendants' taking could hardly be greater. That type of sweeping, "total" copying weighs against fair use. *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) ("[C]opying an entire work militates against a finding of fair use."); *see also McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1178, 1180; *Dr. Seuss*, 983 F.3d at 457.

Relatedly, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material." *McGucken*, 42 F.4th at 1162 n.6; *KCAL-TV*, 108 F.3d at 1122. Here, users of the PMC Defendants' Website could zoom in on the high-resolution reproductions of the Subject Photographs in the galleries and make them larger. *See supra*, Section II.C. Importantly, the PMC Defendants have published posts on the PMC Defendants' Website with no photos—two such posts were even linked-to in the August and September 2020 posts at issue in this case (*see id*.). *See Werner*, 2021 WL 3560588 at *5 ("Defendant could have covered the strange phenomena discussed in the articles without photographic illustration[.]"). And even after the PMC Defendants removed the Subject Photographs from the posts at issue, those posts remain up, advertisements still appear alongside those posts, and those posts continue to generate page views and revenue. SSUMF ¶ 98. Thus, because the Subject Photographs were unnecessary to the PMC Defendants' posts, their

1 copying was "far more than was necessary." *See McGucken*, 42 F.4th at 1162;
2 *Monge*, 688 F.3d at 1179.

3      Such extensive and unjustified copying weighs against fair use.[8] *McGucken*,
4 42 F.4th at 1163.

5      **4. If universalized, the PMC Defendants' uses would destroy an**
6         **established licensing market for the use of property photos in articles**
7         **discussing those properties.**

8      The fourth factor considers "the effect of the use upon the potential market
9 for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor
10 encompasses both (1) "the extent of market harm caused by the particular actions
11 of the alleged infringer," and (2) "'whether unrestricted and widespread conduct of
12 the sort engaged in by the defendant would result in a substantially adverse impact
13 on the potential market' for the original" and "the market for derivative
14 works." *McGucken*, 42 F.4th at 1163; *Dr. Seuss*, 983 F.3d at 458.

15     Because the PMC Defendants' uses of the Subject Photographs were
16 commercial, likely market harm is presumed. *See Disney Enterprises, Inc. v.*
17 *VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017).[9] Accordingly, it is the PMC
18 Defendants' burden to "bring forward favorable evidence about relevant
19 markets." *McGucken*, 42 F.4th at 1163; *Dr. Seuss*, 983 F.3d at 459. Vogts "need
20 only show that if the challenged uses should become widespread, it would

21

22 ───────────────

[8] *See also BackGrid USA*, Case No. 2:21-cv-06543-FWS-SK, Dkt. 47 at 17-18
23 ("[T]he court finds Defendant using the entirety of Plaintiff's five photographs
24 means this factor weighs against finding fair use.").

25 [9] *See also Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 531 (9th Cir. 2008);
26 *BackGrid USA*, Case No. 2:21-cv-06543-FWS-SK, Dkt. 47 at 18 ("[W]hen the
   intended use is for commercial gain, the likelihood of market harm may be
27 presumed."); *Monge,* 688 F.3d at 1176 ("[E]very commercial use of copyrighted
28 material is presumptively an unfair exploitation[.]").

adversely affect the *potential* market for the copyrighted work." *McGucken*, 42 F.4th at 1163 (emphasis added); *Monge*, 688 F.3d at 1182; *Sicre de Fontbrune*, 39 F.4th at 1226 (weighing fourth factor against fair use, even though defendant showed that the price for the original work had increased, because there was no evidence "about the effect on the market for licensing the disputed photographs").

Here, the harm to the market for licensing Vogts' photos is, and would be, undeniable. Vogts has received requests from media publications to use his photos of properties in articles discussing those properties, and in response has granted limited licenses to those publications to use those photos pursuant to specific terms. *See supra*, Section II.A. That Vogts licensed those photos in exchange for attribution, credit, and narrative control in lieu of revenue makes no difference. *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) ("[M]onetary gain is not the sole criterion[.]"); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir.1989) (copying academic work not fair use in part because of value of authorship credit and peer recognition). The PMC Defendants are aware of that, as they have previously sought and obtained permission to use photos in articles "reporting on the property depicted in the photograph[s]" on the condition that a photo credit be attached. *See supra*, Section II.C. Thus, a market exists to republish Vogts' photos. *See VHT*, 918 F.3d at 744 (licensing "a handful of photos" showed "that [a] market was more than 'hypothetical'"); *Werner*, 2021 WL 3560588 at *6 (there were "licensing opportunities" based on plaintiff's operation of syndication agency "which distributes and syndicates his and other photographers' works"). Plus, given their own photography staff, archive of photos, and licensing practices (*see supra*, Section II.B-C; *see also* SSUMF ¶¶ 20, 22-25, 47-50, 96)—and the fact that each of the posts at issue began with a "header photo" consisting of a *licensed photo* of the individual discussed in the post superimposed over an *unlicensed photo* of the

property discussed in the post (*see supra*, Section II.C)—the PMC Defendants cannot genuinely argue otherwise.

Indeed, the PMC Defendants' unauthorized, nearly verbatim reproductions of the Subject Photographs are, by definition, ready market substitutes for the Subject Photographs. To be sure, they are the types of uses of Vogts' photos for which media publications have sought and obtained licenses. Any consumer interested in the Subject Photographs would enjoy the PMC Defendants' uses of the Subject Photographs. And the PMC Defendants displayed high-quality, nearly verbatim copies of the Subject Photographs in galleries with no text crowding the view. Thus, the PMC Defendants' "mere duplication" of the Subject Photographs "underscores the non-transformative nature" of their unauthorized uses thereof, and that those uses 'serve[] as a market replacement for [the originals], making it likely that cognizable market harm to the original[s] will occur.'" *See McGucken*, 42 F.4th at 1164; *Monge*, 688 F.3d at 1182–83.

If carried out in a widespread and unrestricted fashion, the PMC Defendants' conduct would destroy Vogts' licensing market. SSUMF ¶ 18; *see also McGucken*, 42 F.4th at 1163. An infringing use destroys a derivative market when the infringing work is of the same type as existing works by licensed users. *See McGucken*, 42 F.4th at 1163.[10] Here, the PMC Defendants made the same use of the Subject Photographs as publications that sought and obtained licenses for Vogts' photos—i.e., in articles about the properties depicted in those photos. *See supra*, Section II.A; *see also McGucken*, 42 F.4th at 1163. By engaging in the type

---

[10] *See also Dr. Seuss*, 983 F.3d at 460 ("[T]his is not a case where the copyist's work fills a market that the copyright owner will likely avoid"); *Elvis Presley*, 349 F.3d at 631 (because "[I]f this type of use became widespread, it would likely undermine the market for selling Plaintiffs' copyrighted material"); *KCAL-TV*, 108 F.3d at 1122–23 ("[G]iven what LANS and KCAL do, KCAL's use of LANS's work for free, without a license, would destroy LANS's original, and primary market").

of uses of his photos that Vogts specifically reserves the right to control, the PMC Defendants prejudiced Vogts' ability to further license, and regulate the display and distribution of, the Subject Photographs to and by media publications. *See supra*, Section II.A. "If anyone could reprint" the Subject Photographs "for readers interested in" those properties, "the licensing market simply would not exist." *See Werner*, 2021 WL 3560588 at *6. The PMC Defendants are aware of that prospect: PMC's syndication agreements contain limitations on the distribution of photos to PMC's third-party syndication partners (*see supra*, Section II.D), and the PMC Defendants have previously been unable to syndicate content when the owner of the photos displayed in connection with that content "didn't want it there" (*see id*.).

As such, this factor weighs against fair use. *See McGucken*, 42 F.4th at 1164; *Dr. Seuss*, 983 F.3d at 461.

\*    \*    \*

All four fair use factors weigh against the PMC Defendants. *See McGucken*, 42 F.4th at 1164; *Dr. Seuss*, 983 F.3d at 461. Accordingly, the PMC Defendants' fair use defense fails as a matter of law.[11] *McGucken*, 42 F.4th at 1164.

## IV.    CONCLUSION

Artists like Vogts should be encouraged to create new and compelling creative works. And when sophisticated media and publishing companies like the PMC Defendants exploit those works without consent for monetary gain, they should be held accountable. Therefore, Vogts respectfully requests that this Court find the PMC Defendants liable for directly infringing Vogts' copyrights in the Subject Photographs as a matter of law. Upon that adjudication, this case can proceed to trial in a streamlined manner on the issues of willfulness and damages.

---

[11] *See also McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 604-09 (S.D.N.Y. 2020) (holding use of copyrighted works in embedded links to Instagram posts not fair use); *BackGrid USA*, Case No. 2:21-cv-06543-FWS-SK, Dkt. 47 at 19 ("[T]he court grants summary judgment for Plaintiff on Defendant's fair use defense.").

Respectfully submitted,

Dated: March 9, 2023            By:    */s/ Stephen M. Doniger*
                                       Stephen M. Doniger, Esq.
                                       Benjamin F. Tookey, Esq.
                                       DONIGER / BURROUGHS

                                       Attorneys for Plaintiff

## L.R. 11-6.2. Certificate of Compliance

The undersigned certifies that this memorandum of points and authorities complies with the type-volume limitation of L.R. 11-6.1. This certification is made relying on the word count of the word-processing system used to prepare the document.

The undersigned, Plaintiff's counsel of record, certifies that this brief contains fewer than 7,000 words, and complies with the word limit of L.R. 11-6.

Dated: March 9, 2023            By:    */s/ Stephen M. Doniger*
                                       Stephen M. Doniger, Esq.