1  Lincoln D. Bandlow (SBN: 170449)
   Lincoln@BandlowLaw.com
2  Rom Bar-Nissim (SBN: 293356)
   Rom@BandlowLaw.com
3  **Law Offices of Lincoln Bandlow, P.C.**
   1801 Century Park East, Suite 2400
4  Los Angeles, CA 90067
   Telephone: 310.556.9680
5  Facsimile: 310.861.5550

6  Attorneys for Defendants
   Penske Media Corporation
7  and Dirt.com, LLC

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12 BRANDON VOGTS, an individual,        Case No.:  2:22-cv-01153-FWS-PVC

13                 Plaintiff,           **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN SUPPORT OF**
14                                      **THE PMC DEFENDANTS'**
       v.                              **CONSOLIDATED MOTION FOR**
15                                      **SUMMARY JUDGMENT AND**
                                        **OPPOSITION TO PLAINTIFF'S**
16 PENSKE MEDIA CORPORATION,            **MOTION FOR PARTIAL**
   a Delaware Corporation; DIRT.COM,    **SUMMARY JUDGMENT**
17 LLC, a Delaware Limited Liability
   Company; MOVE, INC., a Delaware      [Concurrently-filed with Notice of
18 Corporation, d/b/a Realtor.com; and  Motion; Separate Statement; Declaration
   DOES 1 through 10,                   of Lincoln Bandlow; Declaration of
19                                      Mark David Voss; Declaration of James
                 Defendants.           McClain; Response to Plaintiff's
20                                      Separate Statement; Opposition to
                                        Request for Judicial Notice; [Proposed]
21                                      Judgment]
22
                                        Assigned to: Hon. Fred W. Slaughter
23
24                                      Date:  May 4, 2023
                                        Time: 10:00 a.m.
25                                      Courtroom: 10D
26
27
28

1

2

## **TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………...1

II.     STATEMENT OF FACTS ……...………………………….3

   A. Vogts' Photography…....…………………………………....3

   B. The Subject Photographs......................................................5

      1.  The Stanchfield Photographs…………………….....…….5

      2.  The O'Dowd Photographs…………………….....……….6

      3.  The Williams Photographs…………………….....………6

   C. Overview of Dirt …………………………...…………………...7

   D. The Articles……………………………...……………………...9

      1.  The Stanchfield Article…………………….....………….9

      2.  The O'Dowd Article……………………….....…………10

      3.  The Williams Article……………………….....…………11

III.    LEGAL STANDARD…………………………………...……..12

IV.     LEGAL ARGUMENT…………………………….…………13

   A. Fair Use in General ……………………………………13

   B. The First Fair Use Factor Weighs in Favor of Fair Use……………14

   C. The Second Fair Use Factor Weighs in Favor of Fair Use………...19

   D. The Third Fair Use Factor Weighs in Favor of Fair Use…………..19

   E. The Fourth Fair Use Factor Weighs in Favor of Fair Use ………....21

V.      CONCLUSION ……………………………………….25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Author's Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) (Level, J.)..................................................19

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F.Supp.3d 395 (S.D.N.Y. 2016) ..................................................18

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ...................................................14, 15, 19, 21

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ..........................................................19

*Dr. Suess Enterprises, L.P v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020)..........................................................22

*Elvis Presley Enterprises, Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003)..........................................................23

*Equals Three, LLC v. Jukin Media, Inc.*,
  139 F.Supp.3d 1094 (C.D. Cal. 2015)................................................19

*Friedman v. Live Nation Merchandise*,
  833 F.3d 1180 (9th Cir. 2016)........................................................13

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .........................................................24

*Google, LLC v. Oracle America, Inc.*,
  141 S.Ct. 1183 (2021) ............................................................*passim*

*Hosseinzadeh v. Klein*,
  276 F.Supp.3d 34.............................................................15, 19, 20

*Hughes v. Benjamin*,
  437 F.Supp.3d 382 (S.D.N.Y. 2020)............................................15, 19

*L.A. News Service v. KCAL-TV 9*,
  108 F.3d 1119 (9th Cir. 1997)....................................15, 16, 18, 23

*Mattel v. Walking Mountain Productions*,
　353 F.3d 792 (9th Cir. 2003) ...................................................................... 19, 20

*McGucken v. Newsweek, LLC*,
　464 F.Supp.3d 594 (S.D.N.Y. 2020) ................................................................ 18

*McGucken v. Pub. Ocean Ltd.*,
　42 F.4th 1149 .............................................................................................*passim*

*Momox-Caselis v. Donahue*,
　987 F.3d 835 (9th Cir. 2021) ............................................................................ 13

*National Fire Protection Association, Inc. v. UpCodes, Inc.*,
　2021 WL 4913276 (C.D. Cal. Aug. 9, 2021) .................................................... 24

*Ochoa v. City of Mesa*,
　26 F.4th 1050 (9th Cir. 2022) ........................................................................... 13

*Otto v. Hearst Communications, Inc.*,
　345 F.Supp.3d 412 (S.D.N.Y. 2018) .......................................................... 17, 18

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.*,
　923 F.Supp. 1231 (N.D. Cal. 1995) .................................................................. 24

*Seltzer v. Green Day, Inc.*,
　725 F.3d 1170 (9th Cir. 2013) .................................................................... 14, 20

*Swatch Group Management Services, Ltd. v. Bloomberg L.P.*,
　756 F.3d 73 (2d Cir. 2014) ........................................................................ 18, 20

*TCA Television Corp. v. McCollum*,
　839 F.3d 168 (2d Cir. 2016) ............................................................................. 15

*VHT, Inc. v. Zillow Group, Inc.*,
　918 F.3d 723 (9th Cir. 2019) ............................................................................ 23

*Weissmann v. Freeman*,
　868 F.2d 1313 (2d Cir. 1989) ........................................................................... 24

*Werner v. Red Blue Media, Inc.*,
　2021 WL 3560588 (C.D. Cal. Aug. 9, 2021) .............................................. 18, 23

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
　227 F.3d 1110 (9th Cir. 2000) .......................................................................... 24

**Federal Statutes**

17 U.S.C. § 101 ................................................................................................. 25

17 U.S.C. § 106 ................................................................................................. 24

17 U.S.C. § 106A(a)(1)(A) ............................................................................... 25

17 U.S.C. § 107 ........................................................................................ *passim*

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 56(a) ........................................................ 12, 13

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Penske Media Corporation ("PMC") and Dirt.com, LLC ("Dirt") (collectively, the "PMC Defendants") hereby submit: (1) their cross-motion for summary judgment (the "Cross-Motion"); and (2) opposition to the motion for partial summary judgment ("Motion") of Plaintiff Brandon Vogts ("Vogts").

## I.  INTRODUCTION

Vogts' Motion attempts to argue that the PMC Defendants did not make a fair use of Vogts' photographs (collectively, the "Subject Photographs") that were used in three news articles (collectively, the "Articles"). Not only does the Motion lack merit, but the undisputed facts and legal analysis show that the opposite is true: the PMC Defendants made a fair use of the Subject Photographs as a matter of law.

***Factor One***: The undisputed facts show that the PMC Defendants made a transformative use of the Subject Photographs. The purpose behind Vogts' shooting the Subject Photographs was substantially different from the PMC Defendants' purpose in using them in the Articles. Vogts took the Subject Photographs solely to facilitate the sale of three properties[1] via real estate listing and marketing materials and not to critique their public figure owners/buyers or license them for news stories. Indeed, Vogts did not know the identity of the owners/buyers of the Three Properties and never sought out licensing opportunities for the Subject Photographs. In contrast, the PMC Defendants used the Subject Photographs to provide news reporting and – sometimes snarky – criticism and insight on the public figures that owned the Three Properties. The PMC Defendants did not use the Subject Photographs to market and sell the Three Properties as evidenced by two of the three Articles reporting on properties that were already sold and no longer on the market. The PMC Defendants

[1] The three properties are: (1) 601 Seclusion Lane (the "Stanchfield Property"); (2) 713 N. Alta Vista Blvd. (the "O'Dowd Property"); and (3) 4047 Dixie Canyon Ave. (the "Williams Property") (collectively, the "Three Properties"). The PMC Defendants shall refer to the Subject Photographs of: (1) the Stanchfield Property as the "Stanchfield Photographs"; (2) the O'Dowd Property as the "O'Dowd Photographs"; and (3) the Williams Property as the "Williams Photographs."

transformed the Subject Photographs from anonymous photographs of residential properties, taken and used solely to facilitate their sale, into newsworthy commentary and criticism of the lifestyles of the public figures that owned the Three Properties.

Vogts seeks to portray the PMC Defendants as using the Subject Photographs merely as a visual aid to describe what they depict. Not only does this ignore the substantial commentary in the Articles about the Subject Photographs, but Vogts also relies solely on fair use cases where: (1) the plaintiff was in the same business as the defendant; (2) the defendant used the plaintiff's work for the exact same purpose; and/or (3) the defendant was not significantly commenting on the photos in question.

**Second Factor**: Vogts concedes that the Subject Photographs are published. Vogts merely asserts the Subject Photographs are highly creative – when they are entirely factual. Vogts did not stage the Subject Photographs, use any special angles or do anything other than document the status of the properties. Ironically, the only thing creative in the Photographs are the numerous third-party copyright works such as paintings and sculptures that Vogts copied without permission. Even if the Subject Photographs were creative, this factor is offered little weight – particularly when, as here, the PMC Defendants' use was transformative.

**Third Factor**: The amount and substantiality of the PMC Defendants' use of the Subject Photographs was reasonable in light of their transformative purpose to provide commentary and critique of the lifestyles of public figures. Without the Subject Photographs, this commentary and critique would lose context and utility – further emphasizing its reasonableness. Instead, Vogts' argument relies on two false premises: (1) that the legal standard is necessity; and (2) that the PMC Defendants did not make a transformative use of the Subject Photographs. Neither are true.

**Factor Four**: Most damning, Vogts does not and cannot show market harm. Vogts testified that: (1) he has not licensed photographs commissioned by real estate agents after their initial use (and the Subject Photographs are no exception); and (2) he has not affirmatively sought out opportunities (and is even adverse) to

licensing his photographs commissioned by real estate agents to the media because doing so would interfere with the real estate agents' objectives.

Instead, Vogts contradicts himself by claiming he has established a market for licensing his photographs of celebrity owned properties to the media. He does not. Only on two occasions (in 2014, and 2016, and not since), Vogts authorized the media to use of his photos of celebrity owned properties. Unlike the facts of this case, in both instances, (1) the identity of the celebrity was disclosed in the original real estate listing; (2) the media entity approached the real estate agents who directed the media to speak with Vogts; (3) Vogts only authorized the use after seeking permission of the real estate agent; and (4) the real estate agent authorized the media's use to help market the properties. Also, in both instances, Vogts authorized the use solely for credit and *not payment*. Contrary to Vogts' assertions, market harm requires economic harm that results in supplanting the Subject Photographs and Vogts admitted he has *never* made money from licensing his photos to the media.

In sum, the Motion proceeds on false factual assertions and inapposite law and should be denied, and the PMC Defendants' Cross-Motion should be granted.

## II.   STATEMENT OF FACTS

### A.   Vogts' Photography

Since 2014, Vogts has been a photographer who specializes in photographing real estate. PMC Defendants Separate Statement of Uncontroverted Facts ("DSUF"), ¶ 100. Vogts does not photograph celebrities or engage in sports photography, nor does he specialize in photographing properties owned by celebrities. *Id.*, ¶ 101. Vogts does not photograph real estate without being retained to do so. *Id.*, ¶ 102. The vast majority of Vogts' clients are real estate agents who retain Vogts to photograph a property to facilitate its sale. *Id.*, ¶ 103. Vogts was never retained by a celebrity to photograph the celebrity's home. *Id.*, ¶ 104. Vogts was never retained to photograph real estate for any purpose other than to facilitate the sale of a property or highlight an interior designer's work. *Id.*, ¶ 105.

Vogts takes photographs of properties based on his client's intended purpose. DSUF, ¶ 106. When hired by a real estate agent selling a residential property, Vogts takes photographs of the property with the purpose of: (1) facilitating the sale of the property and highlighting that it would make a good home; and (2) the real estate agent displaying Vogts' photographs on real estate listings and marketing materials to facilitate the sale of the property. *Id*, ¶¶ 107.

Generally, Vogts does not know whether the owner (or potential buyer) of a particular property is a celebrity when he takes his photographs. DSUF, ¶ 108. Vogts does not "stage" his photographs – *e.g.,* he does not move items or furniture in the property prior to taking the photograph. *Id.*, ¶ 109. Vogts' photographs of properties contain numerous unauthorized uses of third-party copyrighted content, such as paintings, photographs and sculptures. *Id.*, ¶ 110.

Vogts does not request photo credit when his real estate agent clients exploit his photographs. DSUF, ¶ 111. When Vogts' photographs are uploaded to a Multiple Listing Service ("MLS") in connection with a real estate listing, the MLS does not allow Vogts to receive a photo credit. *Id.*, ¶ 112.

Aside from two exceptions noted below, Vogts has only been approached by designers and stagers to potentially license his photographs that were commissioned by real estate agents. DSUF, ¶ 113. While Vogts has negotiated terms with designers and stagers, no agreement was ever reached and the photos were never used or licensed by designers or stagers. *Id.*, ¶ 114. Indeed, no third-party has demonstrated interest in licensing Vogts' photographs of residential properties – aside from designers and stagers and the two exceptions noted below. *Id.*, ¶ 115.

Vogts does not attempt to license his photographs of real estate properties to the media because doing so may be inconsistent with his real estate agent client's objectives. DSUF, ¶ 116. Despite photographing countless properties since 2014, Vogts has only been approached by the media to license his photographs of celebrity owned properties twice: once in 2014 and once in 2016. *Id.*, ¶ 117. Both times (1) the

1   media demonstrated interest in Vogts' photographs because the identity of the

2   celebrities that owned the properties were identified in the real estate listing by the

3   real estate agent to market the property; (2) the media contacted the real estate agent

4   prior to contacting Vogts; (3) Vogts authorized the media to use his photographs to

5   facilitate the sale of the two properties; (4) Vogts authorized the media to use his

6   photographs *without monetary compensation* and, instead, only requested credit and

7   that the real estate agent approve the articles to ensure the real estate agent,

8   homeowner and property were viewed in a positive light. *Id.*, ¶ 118.

9         **B.**    **The Subject Photographs**

10          **1.**    **The Stanchfield Photographs**

11       Another real estate photographer hired Vogts to take the Stanchfield

12  Photographs to be used to facilitate the sale of the Stanchfield Property via real estate

13  listings and marketing materials. DSUF, ¶ 119. Vogts charged a flat fee of $▮ to

14  take the Stanchfield Photographs for this purpose. *Id.*, ¶ 120. When Vogts took the

15  Stanchfield Photographs, he did not know that Darby Stanchfield and Joseph

16  Gallegos owned the Stanchfield Property, nor was he aware that they had careers in

17  the entertainment industry. *Id.*, ¶ 121.

18       Vogts does not meaningfully dispute that the Stanchfield Photographs do not

19  themselves contain information regarding: (1) the Stanchfield Property being owned

20  by Ms. Stanchfield and Mr. Gallegos; (2) their careers in the entertainment industry;

21  (3) how they acquired the Stanchfield Property; (4) how the Stanchfield Property

22  was built; (5) the agents involved in the sale of the Stanchfield Property; or (6) the

23  dollar amount of the sale of the Stanchfield Property. DSUF, ¶ 122.

24       Vogts only licensed the Stanchfield Photographs to the real estate agent to

25  facilitate sale through real estate listings and marketing materials. DSUF, ¶ 123.

26  When the Stanchfield Photographs were posted on an MLS, Vogts did not ask for or

27  receive a photo credit. *Id.*, ¶ 124. Vogts did not subsequently license, seek to license

28  (nor did anyone demonstrate interest in licensing) the Stanchfield Photographs after

they were used to facilitate the sale of the Stanchfield Property – nor did he identify any lost licensing opportunities for the Stanchfield Photographs. *Id.*, ¶ 125.

### 2.        The O'Dowd Photographs

Real estate agents hired Vogts to take the O'Dowd Photographs to facilitate the sale of the O'Dowd Property via real estate listings and marketing materials. DSUF, ¶ 126. Vogts charged the real estate agents a flat fee of $■■ to take the O'Dowd Photographs for this purpose. *Id.*, ¶ 127. When he took the O'Dowd Photographs, Vogts did not know that Chris O'Dowd and Dawn O'Porter owned the O'Dowd Property or that they had careers in the entertainment industry. *Id.*, ¶ 128.

Vogts does not dispute that the O'Dowd Photographs do not contain information regarding: (1) the O'Dowd Property being owned by Mr. O'Dowd or Ms. O'Porter; (2) how the O'Dowd Property was acquired; or (3) the history of the O'Dowd Property. DSUF, ¶ 129.

Vogts only licensed the O'Dowd Photographs to the real estate agents to facilitate its sale through real estate listings and marketing materials. DSUF, ¶ 130. When the O'Dowd Photographs were posted on an MLS, Vogts did not ask for or receive a photo credit. *Id.*, ¶ 131. Vogts did not subsequently license, seek to license (nor did anyone demonstrate interest in licensing) the O'Dowd Photographs after they were used to facilitate the sale of the O'Dowd Property – nor did he identify any lost licensing opportunity for the O'Dowd Photographs. *Id.*, ¶ 132.

Vogts was informed of the PMC Defendants' use of the O'Dowd Photographs by one of the real estate agents for the O'Dowd Property. DSUF, ¶ 133. Vogts responded to the real estate agent by stating he would have requested the PMC Defendants provide him photo credit but did not state he would have requested monetary compensation. *Id.*, ¶ 134. Vogts claimed the PMC Defendants' use of the O'Dowd Photographs somehow damaged his reputation. *Id.*, ¶ 135.

### 3.        The Williams Photographs

Real estate agents hired Vogts to take the Williams Photographs to facilitate

the sale of the Williams Property via real estate listings and marketing materials. DSUF, ¶ 136. Vogts charged the real estate agents a flat fee of $██ to take the Williams Photographs. *Id.*, ¶ 137. When Vogts took the Williams Photographs, he did not know that Zak Williams would buy the Williams Property, who Zak Williams was or that he was the son of Robin Williams. *Id.*, ¶ 138.

Vogts does not meaningfully dispute that the Williams Photographs do not contain information about: (1) Robin or Zak Williams; (2) Zak Williams being Robin Williams' son; or (3) that Zak Williams bought the Williams Property. DSUF, ¶ 139.

Vogts only licensed the Williams Photographs to the real estate agents to facilitate its sale through real estate listings and marketing materials. DSUF, ¶ 140. When the Williams Photographs were posted on an MLS, Vogts did not ask for or receive a photo credit. *Id.*, ¶ 141. Vogts did not subsequently license, seek to license (nor did anyone demonstrate interest in licensing) the Willaims Photographs after they were used to facilitate the sale of the Williams Property – nor did he identify any lost licensing opportunities for the Williams Photographs. *Id.*, ¶ 142.

### C.    Overview of Dirt

Dirt is a news publication that reports on real estate transactions involving celebrities, business/civic leaders and other public figures. DSUF, ¶ 143. Its articles provide a unique (and otherwise unavailable) peek into the lifestyles of public figures and provide commentary/critique on them and their properties. *Id.*, ¶ 144. Dirt's writers discover that a public figure is involved in a real estate transaction through a variety of research and journalistic methods. DSUF, ¶ 145. Real estate listings (including those on an MLS) do not contain information on the identity of who bought or, in most cases, sold the property in the real estate listing. *Id.*, ¶ 146. Nor do the photographs used in real estate listings identify who is the buyer or seller of the property depicted in the photographs. *Id.*, ¶ 147. Rather, Dirt's writers typically discover the identity of the public figure that is involved in the transaction by reviewing public records and utilizing third-party sources. *Id.*, ¶ 148.

Dirt's articles: (1) identify public figures who bought and/or sold a property; (2) provide information on the personal, professional and real estate histories of public figures; (3) discuss the value of the property; (4) comment on and critique characteristics of the property; and (5) explain facts about the property, such as when it was built and its ownership history. DSUF, ¶ 149. Dirt articles incorporate some of the photographs from the real estate listings for the property discussed in an article. DSUF, ¶ 150. Dirt uses photographs from anonymous real estate listings in its articles to provide the reader a unique (and otherwise unavailable) peek into the lifestyles and priorities of public figures. *Id.*, ¶ 151. As a general matter, Dirt is unable to photograph on its own the properties discussed in its news articles because public figures generally will not provide the PMC Defendants access to their homes for articles containing information about them. *Id.*, ¶ 152.

On occasion, a real estate agent representing a public figure in a real estate transaction will provide Dirt permission to use the real estate listing photographs for Dirt to publicize the transaction and/or the real estate agent. DSUF, ¶ 153. In most instances, however, Dirt uses the photographs from the real estate listing itself – because no other photographs of the property exist and are unavailable through licensing agents, like Getty or the Associated Press. *Id.*, ¶ 154.

Dirt's articles and use of photographs employ the following format: (1) a headline; (2) followed by the name of the writer and date of the article; (3) followed by an image of the featured property with an image of the public figure's face superimposed on the property (the "Cover Picture"); (4) followed by thumbnails and, upon clicking the thumbnails, a photo gallery opens up that displays the various pictures of the property; (6) followed by data points, such as, the buyer/seller, and the property's location, sale price, square footage, the number of bedrooms and bathrooms and/or lot size ; (7) followed by the text of the article, which is comprised of several paragraphs; (8) followed by the images of the property. DSUF, ¶ 155. Dirt does not provide standalone galleries of photographs; rather, photographs can only

be viewed in connection with the article discussing the particular property. *Id.*, ¶ 156.

### D.   The Articles

#### 1.   The Stanchfield Article

Darby Stanchfield is a professional actress who has starred in such television shows as *Scandal*, *NCIS, Burn Notice, CSI:Miami, How I Met Your Mother, CSI: New York, The Ghost Whisperer, The Mentalist, Mad Men, Jericho, General Hospital, Bones, Nip/Tuck, 24* and *Monk*. DSUF, ¶ 159. Ms. Stanchfield's husband, Joseph Gallegos, was a former executive of Trailer Park, the world's largest entertainment and content marketing agency. *Id.*, ¶ 160.

On Thursday, August 6, 2020, Mr. David received an email from one of his sources that Ms. Stanchfield recently sold the Stanchfield Property. DSUF, ¶ 161. Mr. David further investigated and identified the real estate listings for the Stanchfield Property. *Id.*, ¶ 162. The real estate listings for the Stanchfield Property did not contain information that Ms. Stanchfield or Mr. Gallegos owned the Stanchfield Property, nor did the listings identify the photographer/copyright owner for the Stanchfield Photographs. *Id.*, ¶ 163.

On August 7, 2020, Mr. David wrote and published on Dirt's website an article entitled "Darby Stanchfield Sells Secluded Glendale Traditional" (the "Stanchfield Article") that discussed: (1) that Ms. Stanchfield owned the Stanchfield Property with Mr. Gallegos; (2) details about the couple's entertainment industry careers; (3) how Ms. Stanchfield "took in $2.4 million" selling the "secluded traditional home in the largely unheralded but lovely and affluent foothills above Glendale" after initially purchasing it "in 2009 for a bit less than $1.8 million"; (4) commentary on the Stanchfield Property's location; (5) when the home was built; (6) commentary on aspects of the Stanchfield Property; (7) the size of the Stanchfield Property, including the number of bedrooms and bathrooms; (8) the listing agents; and (9) information on other properties owned by Ms. Stanchfield. DSUF, ¶ 164.

The Stanchfield Article incorporated the Stanchfield Photographs – which

Mr. David downloaded from Realtor.com. DSUF, ¶ 165. The Cover Picture for the Stanchfield Article was an image of Ms. Stanchfield superimposed over the exterior of the Stanchfield Property. *Id.*, ¶ 166. Mr. David incorporated the Stanchfield Photographs into the Stanchfield Article to provide readers with a unique (and otherwise unavailable) insight into the lifestyle of Ms. Stanchfield and Mr. Gallegos, including contextualizing Mr. David's commentary and critique of the Stanchfield Property. *Id.*, ¶ 167. Beyond minor cropping of the Stanchfield Photographs, Mr. David could not use a smaller portion of the individual Stanchfield Photographs or fewer of them because doing so would result in rendering his commentary and critique more difficult for lack of context. *Id.*, ¶ 168.

## 2.    The O'Dowd Article

Christopher O'Dowd is a professional actor who wrote and starred in *Moone Boy*, starred in *State of the Union, Of Mice and Men* and *Get Shorty* and appeared in *The Simpsons, Big Mouth, Family Guy, The Twilight Zone, Thor: The Dark World* and *Family Guy*. DSUF, ¶ 169. Dawn O'Porter is Mr. O'Dowd's wife and an author whose books include *The Cows* and *So Lucky* and a documentarian who created *Super Slim Me* and *Extreme Wife*. *Id.*, ¶ 170.

On September 4, 2020, Mr. David received a tip from a source that Mr. O'Dowd and Ms. O'Porter were selling the O'Dowd Property. DSUF, ¶ 171. Mr. David further investigated and identified the real estate listings for the O'Dowd Property. *Id.*, ¶ 172. The real estate listings for the O'Dowd Property did not contain information that Mr. O'Dowd or Ms. O'Porter owned the O'Dowd Property or identify the photographer/copyright owner for the O'Dowd Photographs. *Id.*, ¶ 173.

On September 15, 2020, Mr. David created and posted an article on Dirt's website entitled "Chris O'Dowd, Dawn O'Porter List Melrose District Bungalow" (the "O'Dowd Article") that discussed: (1) that Mr. O'Dowd and Ms. O'Porter owned the O'Dowd Property; (2) details about their entertainment industry careers; (3) the listing price for the O'Dowd Property and how Mr. O'Dowd and Ms.

O'Porter hoped "to double the not quite $875,000 they paid for the property" seven years prior; (4) commentary on the O'Dowd Property's location; (5) when the O'Dowd Property was built; (6) commentary and critique on aspects of the O'Dowd Property such as its "not-especially-pretty but desirably private front yard [that] opens to a pint-sized courtyard"; (7) the size of the O'Dowd Property, including the number of bedrooms and bathrooms; (8) the listing agents; and (9) commentary on the new residential property acquired by the couple. DSUF, ¶ 174.

The O'Dowd Article incorporated the O'Dowd Photographs – which Mr. David downloaded from Redfin. DSUF, ¶ 175. The Cover Picture for the O'Dowd Article was an image of Mr. O'Dowd superimposed over the exterior of the O'Dowd Property. *Id.*, ¶ 176. Mr. David incorporated the O'Dowd Photographs into the O'Dowd Article to provide readers with a unique (and otherwise unavailable) insight into the lifestyle of Mr. O'Dowd and Ms. O'Porter, including contextualizing his commentary and critique of O'Dowd Property. *Id.*, ¶ 177. Beyond minor cropping of the O'Dowd Photographs, Mr. David could not use a smaller portion of the individual O'Dowd Photographs or fewer of them because doing so would result in rendering his commentary and critique more difficult for lack of context. *Id.*, ¶ 178.

### 3.     The Williams Article

Zak Williams is late actor/comedian Robin Williams' son. DSUF, ¶ 179. Zak Williams was an actor himself, having appeared in *The Graduates* and *Slow Your Roll: Extreme Comedy*. *Id.*, ¶ 180. Zak Williams has spoken publicly on numerous occasions about mental health in light of his father's suicide and is the owner of PYM (Prepare Your Mind) – a mental health supplement company. *Id.*, ¶ 181.

In March of 2021, Mr. McClain was reviewing public records and discovered that Zak Williams purchased the Williams Property. DSUF, ¶ 182. Mr. McClain further investigated and identified the real estate listings for the Williams Property. *Id.*, ¶ 183. The real estate listings for the Williams Property did not contain information that Zak Williams acquired the Williams Property or identify the

photographer/copyright owner for the Williams Photographs. *Id.*, ¶ 184.

On March 10, 2021, Mr. McClain created and posted an article on Dirt's website entitled "Robin Williams' Son Zak Buys French Country-Inspired L.A. Villa" (the "Williams Article") that discussed: (1) Zak's purchase of the Williams Property; (2) Zak being Robin Williams's son; (3) Zak's inheritance; (4) Zak's background; (5) how much Zak paid for the Williams Property; (6) commentary and critique on the "somewhat matronly but still charming property out in a desirable pocket of the San Fernando Valley's Sherman Oaks neighborhood"; (7) when the Williams Property was built; (8) commentary and critique on various aspects of the Williams Property, such as how "the décor can't quite decide if it wants to shoot for the contemporary farmhouse look or stay in its neoclassical comfort zone; the result is a visually mixed bag"; and (9) the size of the Williams Property, including the lot size and number of bedrooms and bathrooms, and how the master bath "needs decorative updates but is perfectly functional." DSUF, ¶ 185.

The Williams Article incorporated the Williams Photographs – which Mr. McClain downloaded from Redfin. DSUF, ¶ 186. The Cover Picture for the Williams Article was an image of Zak Williams superimposed over the exterior of the Williams Property. *Id.*, ¶ 187. Mr. McClain incorporated the Williams Photographs into the Williams Article to provide readers a unique (and otherwise unavailable) insight into the lifestyle of Zak Williams, including contextualizing his commentary and critique of Williams Property. *Id.*, ¶ 188. Beyond minor cropping of the Williams Photographs, Mr. David could not use a smaller portion of the individual Williams Photographs or fewer of them because doing so would result in rendering his commentary and critique more difficult for lack of context. *Id.*, ¶ 189.

## III.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or part of each claim or defense – on which summary judgment is sought." Federal Rule of Civil Procedure ("F.R.C.P.") Rule 56(a). "The court shall grant

1  [partial] summary judgment if the movant shows that there is no genuine dispute as

2  to any material fact." *Id.*  The mere existence of "some alleged factual dispute

3  between the parties will not defeat an otherwise properly supported motion for

4  summary judgment." *Momox-Caselis v. Donahue*, 987 F.3d 835, 941 (9th Cir. 2021)

5  (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Rather, to

6  defeat summary judgment, "the alleged factual dispute must be both genuine and

7  material to the nonmoving party's claims." *Momox*, 987 F.3d at 841 (9th Cir. 2021)

8  (*citing* F.R.C.P. Rule 56(a)). A "material fact is one that is needed to prove (or

9  defend against) a claim, as determined by the applicable substantive law." *Ochoa v.*

10 *City of Mesa*, 26 F.4th 1050, 1055-56 (9th Cir. 2022) (*citing Anderson*, 477 U.S. at

11 255). "'Only disputes over facts that might affect the outcome of the action under the

12 governing law will properly preclude the entry of summary judgment' for purposes

13 of materiality." *Momox*, 987 F.3d at 841 (*quoting Anderson*, 477 U.S. at 248).

14     A "factual issue is genuine 'if the evidence is such that a reasonable jury

15 could return a verdict for the nonmoving party.'" *Ochoa*, 26 F.4th at 1055 (*quoting*

16 *Anderson*, 477 U.S. at 248). The non-moving party must "produce specific facts,

17 affidavit or other evidentiary materials, to show that there is a ***genuine*** issue for

18 trial." *Momox,* 987 F.3d at 841 (original emphasis) (*citing Matsushita Electronic*

19 *Industries v. Zenith Radio*, 475 U.S 574, 587 (1986)). "If the evidence is merely

20 colorable, or is not significantly probative, summary judgment will be granted."

21 *Friedman v. Live Nation Merchandise*, 833 F.3d 1180, 1185 (9th Cir. 2016) (*quoting*

22 *McIndoe v. Huntington Ingalls,* 817 F.3d 1170, 1173 (9th Cir. 2016); *R.W. Beck &*

23 *Associates v. City & Borough of Sitka*, 27 F.3d 1475, 1480 fn. 4 (9th Cir. 1994)).

24 **IV.**   **LEGAL ARGUMENT**

25     **A.**   **Fair Use in General**

26     Under Section 107 of the Copyright Act, "the fair use of a copyrighted work

27 … ***for purposes*** such as ***… criticism, comment [and] news reporting*** … is not an

28 infringement of copyright." 17 U.S.C. § 107 (emphasis added). The fair use doctrine

is "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google, LLC v. Oracle America, Inc.*, 141 S.Ct. 1183, 1196 (2021) (*quoting Steward v. Abend*, 495 U.S. 2017, 236 (1990)).

Under 17 U.S.C. § 107, there are four non-exclusive factors that courts consider when analyzing fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted works.

These factors are "not exhaustive" and "set forth general principles, the application of which requires judicial balancing, depending on the circumstances" that "vary depending on context." *Google*, 141 S.Ct. at 1197 (*citing Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)). Fair use is "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. "Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purpose of copyright." *Id.* at 578 (*citing* Level, *Towards a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110-1111 (1990) ("Leval")).

## B.    The First Fair Use Factor Weighs in Favor of Fair Use

The "'***central purpose***' of the first fair use factor is to see 'whether and to what extent the new work is ***transformative***.'" *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (emphasis added) (*quoting Campbell*, 510 U.S. at 579). A use is transformative when it "adds something new, with a further purpose or different character, altering the copyrighted work with new expression, meaning or message." *Google*, 141 S.Ct. at 1202 (internal quotes omitted) (*quoting Campbell*,

510 U.S. at 579). The transformative use inquiry asks "whether the copier's use 'fulfills the objective of copyright law to stimulate creativity for public illumination.'" *Google*, 141 S.Ct. at 1202-03 (*quoting* Leval at 1111)).

Critically, "the ***more*** transformative the new work, the ***less*** will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (emphasis added). This is because "many common fair uses are indisputably commercial." *Google*, 141, S.Ct. at 1204; *see also Campbell,* 510 U.S. at 585 ("the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research … 'are generally conducted for profit in this country'"). Consequently, "the commercial nature of an allegedly infringing work is not necessarily a significant factor." *Hughes v. Benjamin,* 437 F.Supp.3d 382, 392 (S.D.N.Y. 2020) (*citing Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013)).

The Ninth Circuit has articulated three "benchmarks of transformative use," which are: "(1) ***further purpose or different character*** in the defendant's work, i.e. the creation of ***new information***, new aesthetic, ***new insights and understanding***; (2) ***new expression, meaning, or message*** in the original work, i.e. the addition of value to the original; and (3) the use of the quoted matter as raw material, instead of repackaging it and merely superseding the objects of the original creation." *McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1157 (emphasis added) (*quoting Dr. Suess Enterprises, L.P v. ComicMix LLC*, 983 F.3d 443, 453 (9th Cir. 2020)).

The "fact that [the PMC Defendants were] reporting news ***weighs heavily in its favor*** (§ 107 itself gives news reporting as an example)." *L.A. News Service v. KCAL-TV 9*, 108 F.3d 1119, 1121 (9th Cir. 1997) (emphasis added).[2] It is when the

---

[2] *See also TCA Television Corp. v. McCollum*, 839 F.3d 168, 179 (2d Cir. 2016) (the "uses identified by congress in the preamble of § 107 – criticism, comment [and] news reporting … might be deemed 'most appropriate' for a purpose or character finding indicative of fair use."); *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34, 42 ("there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107").

plaintiff and defendant are "both in the business of gathering and selling news" that the first fair use factor "cuts the other way."[3] *Id.*

Here, the PMC Defendants made a transformative use of the Subject Photographs in the Articles. Vogts is ***not*** in the business of gathering and selling news; he is in the business of creating photographs to facilitate the sale of real estate via real estate listings and marketing materials – and the Subject Photographs were no different.[4] DSUF, ¶¶ 100-107, 119, 123, 126, 130, 136, 140. In contrast, the PMC Defendants are in the business of reporting news – with Dirt's focus on reporting and providing stinging, insightful commentary – on the real estate dealings of the wealthiest and most high profile business and civic leaders, as well as entertainment moguls and celebrities – and their use of the Subject Photographs was no different. *Id.*, ¶¶ 143-151, 155; Section II.D, *infra*.

Moreover, the PMC Defendants provided their readers with "new information … new insights and understandings" into the Subject Photographs that even Vogts himself did not know when he took the Subject Photographs. Vogts admits that when he took all three sets of Subject Photographs, he did not know the celebrity owners or, as applicable, celebrity purchaser. DSUF, ¶¶ 121, 128, 138; *see*

[3] Vogts legal citations emphasize this point. Motion, pp. 13:3-14:15 & fns. 4-5 (*citing L.A. News Service*, 108 F.3d at 1120-21 (factor one weighed against fair use where the plaintiff and defendant were "both in the business of gathering and selling news"); *Barcroft Media, Ltd. v. Coed Media Group*, 297 F.Supp.3d 339, 346 & 351-52 (factor one weighed against fair use where plaintiff's paparazzi celebrity photographs were used in the defendant's celebrity gossip website because the defendant "displayed the images in the same manner and for the same purpose they were originally intended to be used"); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F.Supp.3d 395, 398-99 & 407 (S.D.N.Y. 2016) (factor one weighed against fair use where plaintiff's "photographs and videos of celebrities that it licenses to various print and online publications" was used on the defendant's "for -profit website that presents celebrity gossip news and opines on the veracity of celebrity news" because defendant used the "photo for the precise reason it was created"); *Iowa State University Research Foundation, Inc. v. American Broadcasting Co., Inc.*, 621 F.2d 57, 58-61 (2d Cir. 1980) (factor one weighed against fair use were the plaintiff's biographical documentary on a wrestler was used in the defendant's own biographical documentary on the same wrestler)).

[4] Vogts is so beholden to his real estate agent clients' purpose (*i.e.*, to facilitate the sale of real estate) because he seeks their approval for any subsequent use to ensure the real estate agent, homeowner and property are not portrayed in a negative light.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

in the Subject Photographs and unknown to Vogts when he took them.[5]

Also contrary to Vogts' assertion, this is not an example where the "photos appear[ed] prominently in the article's visual layout" as to "dwarf the text" rendering the article "not primarily as a piece of writing" but "a series of photos with text broken up into tiny captions underneath." *McGucken*, 42 F.4th at 1156. Nor is this an example involving "the mere addition of some token commentary" that "is not enough to transform the use of a photograph." *McGucken v. Newsweek, LLC*, 464 F.Supp.3d 594, 606 (S.D.N.Y. 2020).

Rather, this is an example of where, in "the context of news reporting … the need to convey information to the public accurately … make[s] it desirable … to faithfully reproduce an original work without alteration [and the] altered purpose or context of the work [is] evidenced by surrounding commentary or criticism." *Swatch Group Management Services, Ltd. v. Bloomberg L.P.* ("*Swatch*"), 756 F.3d 73, 84 (2d Cir. 2014) (*citing Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609-10 (2d Cir. 2006); *Nunez*, 235 F.3d at 22-23).

Here, the Articles contained substantial text that was front and center and the Subject Photographs could only be viewed by clicking the link to the gallery or after

[5] Vogts' legal citations emphasize this important difference. Motion, Section III.B.1 (*citing McGucken*, 42 F.4th at 1158 (the defendant's "article [did] not present [the plaintiff's] photos in a new or different light"; rather, the defendant used the plaintiff's photographs "for exactly the purpose for which they were taken: to depict the lake"); *L.A. News Service*, 108 F.3d at 1122 (defendant's use was not transformative because the "tape was simply used as part of [the defendant's] coverage of the [1992 Los Angeles] riots" and did "not appear to have added anything new or transformative to what made the [plaintiff's] work valuable—a clear visual recording of the [Reginald Denny] beating itself."); *Otto v. Hearst Communications, Inc.*, 345 F.Supp.3d 412, 428-29 (S.D.N.Y. 2018) (the plaintiff "took the picture of President Trump with the bride because he wanted to capture something he determined was a newsworthy event" and defendant "reported on the wedding and published the Photograph for this same purpose"; "the use of an image solely to illustrate the content of that image, in a commercial capacity, has yet to be found as a fair use"); *BWP Media USA*, 196 F.Supp.3d at 407 (same); *Werner v. Red Blue Media, Inc.*, 2021 WL 3560588, *4 (C.D. Cal. Aug. 9, 2021) (the defendant's "articles added no new expression, meaning, or message" to the plaintiff's photographs because the articles presented "the subjects of the photographs in precisely the same light as the [d]fendant did" to "depict people and animals doing unusual things" and the "captions, and the selection of photographs for particular lists, simply underscores that fact").

1  reading the text of the Articles themselves. DSUF, ¶¶ 164-166, 174-176, 185-187;

2  *see also Id.*, ¶¶ 149, 155-156. Therefore, this factor favors fair use.

3          **C.**      **The Second Fair Use Factor Weighs in Favor of Fair Use**

4         For the second fair use factor, courts consider whether the allegedly infringed

5  work was previously published or unpublished and whether it is factual or creative.

6  *McGucken*, 42 F.4th at 1161. Vogts admits that the "Subject Photographs [have]

7  been published." Motion, p. 16:14. Further, it is apparent that the Subject

8  Photographs have very limited, if any, creative elements – as Vogts did not stage the

9  Subject Photographs and simply shot the Three Properties in their original state.

10  DSUF, ¶¶ 109-110, 119, 126, 136. Even if they were, this "factor typically has ***not***

11  been terribly significant in the overall fair use balancing." *Mattel v. Walking

12  Mountain Productions,* 353 F.3d 792, 803 (9th Cir. 2003) (emphasis added).[6]

13  Therefore, this fair use factor weighs in favor of fair use.

14          **D.**      **The Third Fair Use Factor Weighs in Favor of Fair Use**

15         The third fair use factor asks whether "the amount and substantiality of the

16  portion used in relation to the copyrighted work as a whole are ***reasonable*** in relation

17  to the purpose of the copying." *Campbell*, 510 U.S. at 586 (emphasis added); *Mattel,*

18  353 F.3d at 803 (same). Contrary to Vogts' assertions, the "law does ***not require*** that

19  the secondary artist may take no more than is necessary." *Cariou*, 714 F.3d at 710

20  (emphasis added) (*citing Campbell*, 510 U.S. at 588; *Leibovitz v. Paramount

21  Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998)); *see also Mattel*, 343 F.3d at 805

22  ("Mattel's argument that [the defendant] could have used a lesser portion of the

---

[6] *See also Equals Three, LLC v. Jukin Media, Inc.*, 139 F.Supp.3d 1094, 1106 (C.D. Cal. 2015) ("the copied work's creative nature is not particularly important where the new work is highly transformative"); *Author's Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015) (Level, J.) ("The second factor has rarely played a significant role in the determination of a fair use dispute"); *Cariou*, 714 F.3d at 710 (the creative nature of a work is of "limited usefulness where, as here, the creative work of art is being used for a transformative purpose") (*quoting Bill Graham Archives*, 448 F.3d at 612); *Hosseinzadeh*, 276 F.Supp.3d at 42 (holding the "second factor [is] rarely found to be determinative"); *Hughes*, 437 F.Supp.3d at 393 (holding the second fair use factor to be of "limited usefulness where the creative work of art is being used for a transformative purpose").

1  Barbie doll is completely without merit and would lead to absurd results").

2        For the third fair use factor, Courts examine the "justification for the

3  particular copying done" and recognize the "extent of permissible copying varies

4  with the purpose and character of the use." *Mattel*, 353 F.3d at 803 (*quoting*

5  *Campbell*, 510 U.S. at 586-87). Copying "a larger amount of material can fall within

6  the scope of fair use where the material copied … is ***central to a copier's valid***

7  ***purpose***." *Google*, 141 S.Ct. at 1205 (emphasis added). The "substantiality factor

8  will generally weigh in favor fair use where, as here, the amount of copying was

9  ***tethered to a valid, and transformative, purpose***." *Id.* (emphasis added). Thus, even

10  "***entire verbatim reproductions are justifiable*** where the purpose of the work differs

11  enough from the original." *Mattel*, 353 F.3d 792 fn. 8 (emphasis added); *see also*

12  *Swatch*, 756 F.3d at 84 ("news reporting" may necessitate the defendant to

13  "faithfully reproduce an original work without alternation.")

14        Here, the PMC Defendants' use of the Subject Photographs was reasonable

15  in relation to their transformative purpose of reporting on the public figures'

16  ownership of the Three Properties and commenting on their lifestyles.[7] Section IV.B,

17  *supra*; DSUF, ¶¶ 167-168, 177-178, 188-189 Additionally, the Subject Photographs

18  were not further divisible, as doing so would result in Dirt's commentary on the

19  Three Properties and their owners losing context and utility.[8] *Id.*, ¶¶ 168, 178, 189.

20  [7] Vogts also attempts to argue that "the Subject Photographs were ***unnecessary*** to the
PMC Defendants' posts" because "the PMC Defendants have published posts …

21  with no photos [and they] removed the Subject Photographs from the posts at issue."
Motion, pp. 17:20-18:2 (emphasis added). Not only does Vogts advance the rejected

22  "necessary" standard; a comparison of the Articles with the Subject Photographs and
without them unequivocally demonstrate that the Articles' commentary becomes

23  more difficult and loses context and utility without the Subject Photographs *See*
*Hosseinzadeh*, 276 F.Supp.3d at 46 (where a lesser amount used would result in the

24  transformative use "los[ing] context and utility," the amount used by the used by the
defendant is "reasonable to accomplish the transformative purpose.") (*citing*

25  *Campbell*, 510 U.S. at 588); *Nunez*, 235 F.3d at 22 (reproducing the entire
photographs was reasonable to place the defendant's "news articles in context" and

26  not doing so would have made it "much more difficult to explain the controversy").

27  [8] *See Nunez*, 235 F.3d at 24 (defendant "copied the entire picture; however, to copy
any less than that would have made the picture useless to the story"); *Seltzer*, 725

28  F.3d at 1178 ("this factor will not weigh against an alleged infringer" where a work
"is not meaningfully divisible").

1   Therefore, this fair use factor weighs in favor of fair use.

2   **E.    The Fourth Fair Use Factor Weighs in Favor of Fair Use**

3   The "fourth statutory factor focuses upon the 'effect' of the copying in the

4   'market for or value of the copyrighted work.'" *Google*, 141 S.Ct. at 1206 (*quoting*

5   17 U.S.C. § 107(4)). Market harm is "a matter of degree, and the importance of this

6   factor will vary, not only with the amount of harm, but also with the relative strength

7   of the showing on the other factors." *Campbell*, 510 U.S. at 591 fn. 21. Courts

8   examine "(1) the extent of market harm caused by the particular actions of the

9   infringer; and (2) whether unrestricted and widespread conduct of the sort engaged in

10   by the defendant would result in substantially adverse impact on the potential market

11   for the original" *McGucken*, 42 F.4th at 1163. When the secondary use is

12   transformative, "the allegedly infringing use does not substitute for the original"

13   because it "serves a 'different market function'" and, therefore, "weighs in favor of

14   fair use." *Id.* at 1164 (*quoting Seltzer*, 725 F.3d at 1179; *Campbell*, 510 U.S. at 591).

15   Here, as discussed in Section IV.B, the PMC Defendants' use of the Subject

16   Photographs was transformative and serves a "different market function." Vogts took

17   the Subject Photographs to facilitate the sale of the Three Properties through real

18   estate listings and marketing materials, while the PMC Defendants used the Subject

19   Photographs to provide commentary on the public figures associated with the Three

20   Properties (usually after they were sold). Nor does Vogts argue that the PMC

21   Defendants' use resulted in lost licensing opportunities. Vogts makes no such

22   argument because he cannot: he never subsequently licensed for a fee any of his

23   photographs commissioned by real estate agents, including the Subject Photographs.

24   DSUF, ¶¶ 114-118, 125, 132, 142.

25   In an effective concession, Vogts instead argues: (1) that market harm is

26   presumed when the use is commercial; (2) he claims to have an existing market of

27   licensing his photographs to the media; (3) market harm can include failure to

28   provide attribution and third-party approvals; (4) mere duplication of the work

21

1  results in market harm; and (5) that the PMC Defendants' have staff photographers

2  and licensing practices demonstrate market harm. *See* Motion, Section III.B.4.

3       First, there is no presumption of market harm for commercial uses. The Ninth

4  Circuit stated: "Mindful of the Court's directive to 'eschew presumptions under this

5  factor, we ***refrain from presuming harm*** in the potential market' ***for commercial***

6  ***uses*** and 'determine it in the first instance.'" *Dr. Suess*, 983 F.3d at 459 (emphasis

7  added) (*quoting Monge*, 688 F.3d at 1181).

8       Second, Vogts admits he does not attempt to license his photographs of

9  celebrity owned properties to the media because doing so may be inconsistent with

10 his real estate agent clients' objectives. DSUF, ¶ 116; *see also Id.*, ¶¶ 106-107, 118.

11 Therefore, this is "a case where the copyist's work fills a market that the copyright

12 owner will likely avoid" – which favors fair use. *Dr. Suess*, 983 F.3d at 460.

13      Third (and related to the second), despite being a professional photographer

14 since 2014, Vogts has only licensed his photographs to the media on two occasions

15 in 2014 and 2016 and has not done so since. DSUF, ¶ 117. In both instances, the

16 media contacted the real estate agent and Vogts authorized the use (for free) –

17 namely because promoting the sale of a celebrity owned property served the real

18 estate agent's objectives. *Id.*, ¶ 118.

19      Fourth, the two instances where Vogts did authorize the media to use his

20 photographs of celebrity owned properties are readily distinguishable from the PMC

21 Defendants' use of the Subject Photographs. In both instances, the media

22 demonstrated interest in the photographs precisely because the identity of the

23 celebrity owner was disclosed in the real estate listing as part of the marketing

24 strategy for the property, and because the real estate agent expressly authorized the

25 use to promote the sale of the property in question. DSUF, ¶¶ 117-118. Here, the real

26 estate agents did not identify the public figures that owned (or acquired) the Three

27 Properties in the real estate listings. *Id.*, ¶¶ 163, 173, 184 ; *see also Id.*, ¶ 146-147.

28 Rather, it was the PMC Defendants' journalism that revealed that the Subject

Photographs were of celebrity owned properties. *Id.*, ¶¶ 161-162, 171-172, 182-183; *see also Id.*, ¶¶ 148, 151 Moreover, the PMC Defendant's use was for social criticism and comment and were not promoting the sale of the property (indeed, the Stanchfield Property and Williams Property had already been sold) and thus neither the real estate agents **nor Vogts** would have approved/licensed this particular newsworthy commentary on the Three Properties and their owners. *Id.*, ¶¶ 106-107, 116, 119, 123, 126, 130, 135-136, 140, 143-151, 164, 174, 185; Section IV.B, *supra*.

Fifth, Vogts' citations in support of an existing market are also readily distinguishable. Motion, p. 19:19-20 (*citing VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019); *Werner*, 2021 WL 3460588 at *6). In *Werner,* it was "undisputed" that the plaintiff had "licensing 'opportunities' for the photographs **at issue in [that] case**" – which is not present here. 2021 WL 3460588 at *6 (emphasis added). Nor does Vogts operate "an editorial syndication agency, which distributes and syndicates his and other photographers works." *Id.* In *VHT*, the court noted that the plaintiff had "licensed only a handful of photos for secondary uses" (*i.e.*, the photos in dispute) and was "actively exploring the market for licensing its photos" to the defendants – which is not present here. 918 F.3d at 744.

*McGucken* further emphasizes this point. In *McGucken*, there was "no dispute that a market exist[ed] to republish [the plaintiff's] photos" and, if "carried out in a widespread unrestricted fashion, [the defendant's] conduct would destroy [the plaintiff's] licensing market because the defendant "made the ***same use*** of [the plaintiff's] photos as the publications that obtained licenses—copying them in an online article about the ephemeral lake." 42 F.4th at 1163 (emphasis added).[9]

---

[9] *See also Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) (finding market harm because: (1) the defendant had "expressly advertised" its documentary contained "the television appearance for which [the] [p]laintiffs normally charge a licensing fee"; and (2) the "use of the television appearances was, in some instances, not transformative, and … serve the same purpose as [the] original works."); *L.A. News Service*, 108 F.3d at 1122-23 (the plaintiff's "tape had been licensed-and published—before [the defendant's] use, and was licensed after its use" and therefore, the defendant's use "would destroy [the plaintiff's] original, and primary market.")

Sixth, Vogts attempts to demonstrate an existing market by strangely arguing that the PMC Defendants have "photography staff, archive of photos, and licensing practices." Motion, pp. 19:23-20:2. Vogts cites no law for the proposition that the existence of these things has any bearing on whether Vogts has an existing market for licensing his photographs to the media.

Seventh, Vogts falsely argues that it "makes no difference" for the fourth fair use factor that Vogts authorized the media to publish his photos merely for "attribution, credit, and narrative control in lieu of revenue." Motion, p. 18:7-19.[10] "The Factor Four analysis is concerned with **only one type of economic injury** to a copyright holder: the harm that results because **the secondary use serves as a market substitute for the work**." *National Fire Protection Association, Inc. v. UpCodes, Inc.*, 2021 WL 4913276, *7 (C.D. Cal. Aug. 9, 2021) (emphasis added) (*quoting Authors Guild,* 755 F.3d at 99).[11] Vogts does not and cannot demonstrate that failure to credit results in economic injury under the fourth fair use factor because the omission of credit is not a market substitute for the Subject Photographs. Indeed, Vogts has alleged a claim for copyright infringement (*i.e.*, the unauthorized use of the exclusive rights in 17 U.S.C. Section 106) and not a right of attribution claim

---

[10] Vogts' citations do not stand for the broad proposition that failure to credit and narrative control are sufficient to demonstrate market harm. Motion, p. 18:11-15 (*citing Worldwide Church of God v. Philadelphia Church of God, Inc.* ("*Worldwide*"), 227 F.3d 1110, 1117 (9th Cir. 2000); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)). In *Weissmann*, "the Second Circuit recognized that, in the **unusual setting of academia**, a defendant can profit personally from copying despite the lack of a monetary gain" by "**claim[ing] credit for himself**", thereby aiding his professional advancement." *Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 923 F.Supp. 1231, 1244 (N.D. Cal. 1995) (emphasis added). Here, the PMC Defendants did not take credit for the Subject Photographs and attributed the source to Redfin. In *Worldwide*, attribution was not at issue whatsoever but the infringement of a non-profit religious organization's work that resulted in economic harm from diverting "members and **contributions**" to the religious organization. *Worldwide*, 227 F.3d at 1119 (emphasis added).

[11] *See also Google*, 141 S.Ct. at 1206 (the fourth fair use factor considers "the amount … of the loss"); *Garcia v. Google, Inc.*, 786 F.3d 733, 744-745 (9th Cir. 2015) ("copyright supplies the **economic incentive** to create and disseminate ideas" and does not protect against "damages that **unrelated** to the value and marketability of their works" – such as "emotional distress, the destruction of [the author's] career and reputation," or "privacy").

1  under 17 U.S.C. Section 106A(a)(1)(A) ("the author of a work of visual art … shall
2  have the right … to claim authorship of that work"). Nor could he because the
3  Subject Photographs do not fall within the definition of "work of visual art" under 17
4  U.S.C. Section 101 because they are not "still photographic image[s] produced for
5  exhibition purposes only, existing in a single copy that is signed by the author, or in
6  a limited edition of 200 copies or fewer that are signed and consecutively numbered
7  by the author." 17 U.S.C. § 101.

8        Finally, Vogts' argues that mere duplication of the Subject Photographs
9  results in market harm. Motion, p. 20:3-14. A closer examination of Vogts' citations
10 demonstrates that mere duplication results in market harm *only* where the secondary
11 use is not transformative – which is not the case here.[12]

12 **V.    CONCLUSION**

13       Vogts takes pictures of houses solely to help owners sell them. The PMC
14 Defendants used these photographs for the transformative purpose of reporting on
15 the lives of rich, powerful and influential public figures. This was a classic fair use.
16 Thus, the PMC Defendants respectfully request that this Court grant their Cross-
17 Motion and deny Vogts' Motion. Alternatively, should factual disputes remain, the
18 PMC Defendants request that such factual disputes be submitted to the jury.

19  Dated:  March 23, 2023                    **Law Offices of Lincoln Bandlow**

20

21                                     By _____
22                                         LINCOLN D. BANDLOW
                                          ROM BAR-NISSIM
23                                         Attorneys for Defendants Penske
                                          Media Corporation and Dirt.com,
24                                         LLC

25 [12] *See Monge*, 688 F.3d at 1182-83 (the defendant "did not transform the images and
26 create a new work; instead, [the defendant's] mere duplication of the photos 'serves
   as a market replacement for the originals, making it likely that cognizable market
27 harm to the originals will occur.'" (brackets omitted); *McGucken*, 42 F.4th at 1164
   (discussing how the lack of transformative elements highlighted market substitution).

28