Stephen M. Doniger (SBN 179314)
stephen@donigerlawfirm.com
Benjamin F. Tookey (SBN 330508)
btookey@donigerlawfirm.com
DONIGER / BURROUGHS
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRANDON VOGTS,<br><br>Plaintiff,<br><br>v.<br><br>PENSKE MEDIA CORPORATION; DIRT.COM, LLC; et al.,<br><br>Defendants. | Case No. 2:22-cv-01153-FWS-PVC<br>*Hon. Fred W. Slaughter Presiding*<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I. INTRODUCTION .......... - 1 -

II. ARGUMENT .......... - 1 -

A. The PMC Defendants' uses did not comment on or critique Vogts or the Subject Photographs and were otherwise non-transformative .......... - 2 -

B. The PMC Defendants do not seriously dispute that the Subject Photographs are original, creative works .......... - 6 -

C. The PMC Defendants had no real need to use all 53 Subject Photographs, and admit they publish other posts without photos. .......... - 7 -

D. The PMC Defendants cannot dispute that, if universalized, their uses would destroy potential licensing markets for Vogts' photos. .......... - 9 -

III. CONCLUSION .......... - 12 -

# TABLE OF AUTHORITIES

Page(s)

Cases

*BackGrid USA, Inc. v. Haute Living Inc.*, 2023 WL 2347082 (C.D. Cal. Jan. 6, 2023) .......... 10

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339 (S.D.N.Y. 2017) .......... 5

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) .......... 5, 6

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) .......... 2

*Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255 (4th Cir. 2019) .......... 4, 8, 12

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) .......... 11

*Davis v. United States*, 2010 WL 334502 (C.D. Cal. Jan. 28, 2010) .......... 1

*Dr. Seuss Enterprises, L.P . v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) .......... 9, 12

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003) .......... 3

*Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199 (S.D.N.Y. 2021) .......... 6

*Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52 (E.D.N.Y. 2021) .......... 5, 11

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .......... 4, 5

*Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34 (S.D.N.Y. 2017) .......... 6

*McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149 (9th Cir. 2022) .......... Passim

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287 (C.D. Cal. 1995) .......... 11

*Michael Grecco Prods., Inc. v. Livingly Media, Inc.*, 2021 WL 2546749 (C.D. Cal. Apr. 16, 2021) .......... 10

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482 (S.D.N.Y. 2018) .......... 6

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) .......... 5, 8

*Murphy v. Millennium Radio Group LLC*,
650 F.3d 295 (3d Cir. 2011) .................................................................... 9

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000)........................................................................ 6

*Otto v. Hearst Commc'ns, Inc.*,
345 F. Supp. 3d 412 (S.D.N.Y. 2018) ................................................. 6, 11

*Ringgold v. Black Entm't Television, Inc.*,
126 F.3d 70 (2d Cir.1997) ........................................................................ 11

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992) ...................................................................... 7

Other Authorities

L.R. 11-6.2.................................................................................... 1, 2, 13

# MEMORANDUM OF POINT AND AUTHORITIES

## I. INTRODUCTION

As a matter of law, fair use does not permit a media publication to freely take copyrighted photos[1] for use in articles to simply show their contents without commenting on or criticizing them or the photographer. This is especially so where that publication works with licensing companies (e.g., Getty Images) to both obtain photos for such uses and license its own photos, thus participating in the well-established photo licensing market. Because those are the undisputed material facts here, this is not a case of fair use and the PMC Defendants are liable for infringing Vogts' copyrights in the Subject Photographs as a matter of law.

## II. ARGUMENT

The PMC Defendants' improper brief[2] fails to address, and thus concedes, Vogts' prima facie claim of infringement and the failure of all "affirmative defenses" other than fair use. It also fails to even argue fair use as to the following secondary uses of the Subject Photographs: (1) the use of Subject Photographs 1, 32, and 40 in newsletters, (2) the use of Subject Photograph 40 in two social media posts, and (3) the syndication of the offending posts to both other PMC brands and third-party syndication partners. It was Defendants' burden to show that *each* secondary use of

---

[1] Contrary to their motion on the number of available statutory damages awards (Dkt. 43-1), the PMC Defendants admit that Subject Photographs are "individual [] Photographs." *See* Dkt. 53-6 ¶¶ 15, 22; Dkt. 53-23 ¶ 17. They also admit that they selected those photos for their individual characteristics. *See* Dkt. 53-6 ¶¶ 14, 21; Dkt. 53-23 ¶ 16.

[2] The PMC Defendants' brief is 8,796 words, 1,796 more words than Civil L.R. 11-6 allows. A failure to comply with the Local Rules can result in sanctions, including the Court striking non-compliant filings. *See, e.g., Davis v. United States*, No. EDCV070481, 2010 WL 334502, at *1 (C.D. Cal. Jan. 28, 2010). To prevent the PMC Defendants from benefiting from their non-compliance, this Court should either strike their filing or decline to consider anything after the 7,000-word mark.

the Subject Photographs is fair. *See* Dkt. 44 at 11 n.3; *see also, e.g.*, *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 308, 313 (4th Cir. 2010) (analyzing use of logo in "highlight films" separately from use of logo "in the lobby of the Ravens corporate headquarters"). The PMC Defendants thus concede those unaddressed uses.

With respect to the only use that they do address—the display of the Subject Photographs in posts on their Website—the PMC Defendants offer nothing more than conclusory rhetoric. Because they do not genuinely dispute the material facts (*see generally* Dkt. 53-4), it is appropriate for this Court to determine the legal significance to be drawn from those facts. As discussed below, that determination must be that the PMC Defendants have no viable fair use defense and are liable for infringing Vogts' copyrights in the Subject Photographs as a matter of law.

**A. The PMC Defendants' uses did not comment on or critique Vogts or the Subject Photographs and were otherwise non-transformative.**

The PMC Defendants do not genuinely dispute that their use of the Subject Photographs was commercial and non-transformative. They displayed essentially unaltered, high-resolution copies of the Subject Photographs in for-profit posts as visual representations of the properties depicted in the Subject Photographs; failed to credit or otherwise identify Vogts as the source of the Subject Photographs; and did not report on, comment on, or critique either Vogts or the Subject Photographs. *See* Dkt. 53-4 ¶¶ 16-17, 31, 35-36, 43, 45, 51, 65, 95.

The PMC Defendants nonetheless argue[3] that their use of the Subject Photographs was transformative because it was in the "wider context" of the factual presentations about the properties—i.e., that the posts' tangents provided information about related topics that were "more expansive" than the Photographs themselves. *See*

[3] Page 17 of the PMC Defendants' opposition is blank. *See* Dkt. 53-1 at 22 of 30. The PMC Defendants are thus precluded from raising in their sur-reply, or at oral argument, any text that was supposed to be on that page (if any), particularly given that their brief was still over 1,800 words more than permitted under Civil L.R. 11-6.

Dkt. 53-1 at 16-18. But if that argument held water, seminal Ninth Circuit cases rejecting fair use defenses would have turned out differently. For example, *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 625 (9th Cir. 2003) found that the use of numerous clips from a series of videos of Elvis performances in a 16-hour documentary covering "virtually all aspects of Elvis' life" was not fair, rejecting the very argument the PMC Defendants assert. That the documentary presented details about Elvis beyond what the clips conveyed *did not* establish transformative use of the clips since they "serve[d] the same intrinsic entertainment value that is protected by Plaintiffs' copyrights," and the 16 hours of further facts about Elvis presented alongside the clips played no role in the analysis. *Id*. at 629; *see also McGucken*, 42 F.4th at 1160 ("That these other topics are discussed in other portions of the article does not alter our conclusion that McGucken's photos are used simply to illustrate the ephemeral lake and therefore lack any transformative character.").

Cases like *Elvis Presley* and *McGucken* foreclose the PMC Defendants' argument because the Website posts do not discuss or reference Vogts or the Subject Photographs, and the PMC Defendants' admit that their uses of those Photographs merely illustrated some of the aspects of the properties discussed in the posts:

> Q. What's the purpose of the photo galleries that are in Exhibit 37 and -- 36 and 37?
> **A. For people to look at.**
> Q. For people just to see the homes?
> **A. Yeah, because we commented on that in the article, so it gives a visual representation of what we've -- some of the things we've talked about in the article.**

*See* Dkt. 44-7 (Dirt Dep. 87:20-88:2).

> Q. So you used these fifteen images in the Zak Williams article; is that correct?
> **A. Yes.**

Q. Do you recall when you saved these images from an MLS or an aggregate website, whether there were other images of this same property?
**A. Yes.**
Q. How many others, to your recollection? How many other images of this property were there, to your recollection?
**A. I believe there were several dozen more.**
Q. Why did you pick these particular fifteen?
**A. I thought that they represented the house well.**
Q. What do you mean by that?
**A. They showed off the parts of the house that I wanted to talk about in the story.**

*See* Dkt. 44-6 (McClain Dep. 105:3-22).

By their own words, the PMC Defendants used the Subject Photographs expressly for their content. *See also* Dkt. 53-4 ¶ 95 (admitting that "the articles at issue" regard "the contents of the Subject Photographs"). They even titled the gallery displaying Subject Photographs 21-38 "***Look Around*** Chris O'Dowd's L.A. Bungalow" (Dkt. 44-14 at 2-21 of 38, emphasis added; *see also* Dkt. 53-4 ¶ 59). Providing their Website users with "information" on the discussed individuals and properties is simply not transformative; "if this were so, virtually all illustrative uses of photography would qualify as transformative[.]" *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 264–65 (4th Cir. 2019).

The PMC Defendants' argument that they used the Subject Photographs in news reporting (Dkt. 53-1 at 16-18) also fails.[4] Even assuming the label of "news reporting" applies to the infringing uses—*see Harper & Row Publishers, Inc. v.*

[4] The PMC Defendants' argument that they and Vogts are in different businesses (Dkt. 53-1 at 16) has no bearing. The same was true in *McGucken*, 42 F.4th 1149, 1158–61 (9th Cir. 2022)—where a media company posted an online article "reporting" on the subject matter of the asserted photos taken by a professional photographer and used those photos as illustrations thereof—and the Ninth Circuit did not even *discuss* the parties' different businesses in holding that those were non-transformative uses.

*Nation Enterprises*, 471 U.S. 539, 561 (1985) ("[C]ourts should be chary of deciding what is and what is not news") (internal citations omitted)—the news reporting must be about the Subject Photographs *themselves* or Vogts *himself*, not merely about *the subject matter* of those Photographs. As the Supreme Court explained, "the promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'" *See id*. at 557, 561.

"News reporters" have a colorable (i.e., not guaranteed) claim of transformation when a copyrighted work "*is* the story, such as a controversy over a congressman's 'salacious' photos[.]" *See Monge*, 688 F.3d at 1176 (emphasis in original); *see also Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) ("[D]isplay of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about* that work.") (emphasis in original). But that is not the case here. The PMC Defendants claim "substantial commentary in the Articles about the Subject Photographs" (Dkt. 53-1 at 2:4-9) but point to *nothing* in the posts that in any way comments on either the Subject Photographs *themselves* or Vogts *himself*. Rather, they simply "lift[ed] someone else's copyrighted material because it provides an attractive image to go along with the story[.]" *See Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 61–62 (E.D.N.Y. 2021). Finding such uses to be fair would "eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law." *See Barcroft*, 297 F. Supp. 3d at 352; *Monge*, 688 F.3d at 1175 (holding use of wedding photos in article covering wedding brought "no real transformation of the photos themselves").

The PMC Defendants' citation to *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) proves that point. There, Grateful Dead concert posters were reproduced, in significantly reduced size, on an illustrated timeline of the band's history to document those specific concerts. *Id.* at 608-09. That use was deemed fair because it *commented on the copyrighted work itself. See id*. "No

reasonable juror would find that any changes Defendants made, if any, amounted to the significance of the changes made in *Bill Graham Archives*" because the Subject Photographs were created to illustrate aspects of properties, "the same exact purpose for which [the PMC Defendants] used the image[s]." *See Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 505–06 (S.D.N.Y. 2018).[5]

Ultimately, "[t]he use of an image solely to illustrate the content of that image, in a commercial capacity, has yet to be found as fair use." *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 428 (S.D.N.Y. 2018). There is good reason for that. "Defendants' argument, if accepted, would effectively eliminate the livelihood of many photojournalists [and other photographers] like Plaintiff." *Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 236–37 (S.D.N.Y. 2021). Instead, to be transformative, the infringing use must bring about a stark change in expression. *See McGucken*, 42 F.4th at 1159. There was no such change here. This factor weighs heavily against a finding of fair use.

**B. The PMC Defendants do not seriously dispute that the Subject Photographs are original, creative works.**

The PMC Defendants' arguments that the Subject Photographs were previously published and "have very limited, if any, creative elements" (Dkt. 53-1 at 19) seem to willfully ignore controlling authority that the prior publication of a work in no way favors fair use (*see* Dkt. 44 at 16:5-7, 16:14-19) and that property photos are creative works (*see* Dkt. 44 at 16:3-13). Indeed, the Subject Photographs were shot, edited, and created by a professional photographer (Vogts) for public viewing (*see* Dkt. 53-4 ¶¶ 11-14), and the PMC Defendants selected them because of their aesthetic value (*see, e.g.*, Dkt. 44-7 (Dirt Dep. 87:20-88:2), Dkt. 44-6 (McClain Dep. 105:3-22)).

---

[5] *See also Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 40-41, 46 (S.D.N.Y. 2017) (secondary use held fair because it mocked and parodied the copyrighted video itself); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 21-24 (1st Cir. 2000) (secondary use held fair because it reported on the copyrighted photos themselves).

Copyright law has long recognized that photographs are the protectable, cumulative manifestation of many artistic choices—including "lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved"—made in the interval between the shutter opening and closing. *See Rogers v. Koons*, 960 F.2d 301, 307-08 (2d Cir. 1992). It is of no consequence that Vogts did not stage the properties, and the PMC Defendants efforts to denigrate Vogts' photos cannot strip away the protections copyright law affords.

**C. The PMC Defendants had no real need to use all 53 Subject Photographs, and admit they publish other posts without photos.**

The PMC Defendants' use of the 53 nominally cropped Subject Photographs took the heart of each of those Photographs and was gratuitous. *See McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022) (no fair use in part because "[q]uantitatively, twelve of McGucken's photos are used with only negligible cropping," and "[q]ualitatively, given how much was taken, it is clear that the article took 'the heart' of each of the twelve photos").

The PMC Defendants do not dispute that they posted high-resolution reproductions of the Subject Photographs in galleries that their Website users could zoom in on (Dkt. 53-4 ¶ 43), and doing so was not necessary. Indeed, the PMC Defendants do not dispute that there are posts on their Website without any photographic illustration (including two such posts linked-to in the August and September 2020 posts at issue). *Id.* ¶ 38. Nor do the PMC Defendants dispute that since the removal of the Subject Photographs, the posts at issue remain available to viewers *and continue to generate page views and revenue*. *Id.* ¶ 98. All of this shows that the PMC Defendants had no real need to copy the Subject Photographs, let alone all 53 of them. They could have simply provided a link to the redfin.com and realtor.com listings on which the Subject Photographs were lawfully displayed.

Even so, the PMC Defendants argue that the standard for this factor is not "necessity," and that the Subject Photographs "were not further divisible." Dkt. 53-1

at 19-20. The first argument is unavailing and the second borders on unintelligible. First, whether it was necessary for the PMC Defendants to take the quantitative and qualitative amount that they did is a critical part of this inquiry. *See, e.g.*, *McGucken*, 42 F.4th at 1162 ("[C]opying the entirety of twelve of the[] [photos] would be 'far more than was necessary.'"); *Monge*, 688 F.3d at 1179 ("[Maya's] reporting purpose could have been served through publication of the couple's marriage certificate or other sources rather than copyrighted photos . . . . Maya used far more than was necessary to corroborate its story[.]"). By failing to argue qualitative or quantitative necessity, the PMC Defendants concede that this consideration weighs against them.

Second, the PMC Defendants' argument that using fewer of the Subject Photographs would have made their posts "lose[] context and utility" because those Photographs are "not further divisible" (Dkt. 53-1 at 20) is befuddling.[6] The posts at issue used 20 photos (Nos. 1-20), 18 photos (Nos. 21-38), and 15 photos (Nos. 39-53), respectively, and there is no set number of photos used per post. *See* Dkt. 44-6 (McClain Dep. 105:14-16), Dkt. 44-7 (Dirt Dep. 101:21-102:18). Yet the PMC Defendants suggest that the posts at issue would lose "context and utility" if they only used three, five, or even 10 photos of each property. That is nonsense. The posts do not even specifically discuss what is depicted in each Subject Photograph, and all originally-included information and discussion about the sales of the properties remains unchanged in the still-live-and-viable posts, even after the removal of the Subject Photographs. That is why the PMC Defendants ***do not and cannot*** assert that their "ability to accomplish [their] purpose of communicating information about" the discussed individuals and properties would "be hindered if [they] had to comply with [Vogts'] copyright." *See Brammer*, 922 F.3d at 264–65.

[6] Defendants fail to explain what they mean by the term "further divisible." Vogts reserves the right to respond to this assertion if/when the PMC Defendants belatedly offer an explanation or justification.

In short, the PMC Defendants used nearly the entirety of each Subject Photograph and offer this Court nothing proving that they *needed* to do so. They never even *attempted* to visit any of the properties or capture their own photos thereof. Dkt. 44-7 (Dirt Dep. 88:18-23). This factor weighs against a finding of fair use.

**D. The PMC Defendants cannot dispute that, if universalized, their uses would destroy potential licensing markets for Vogts' photos.**

The PMC Defendants' failure to submit any "evidence about relevant markets," as was their burden, justifies finding against them. *See* Dkt. 44 at 18:17-19; *Dr. Seuss*, 109 F.3d at 1403 ("Given [defendants'] failure to submit evidence on this point, instead confining 'themselves to uncontroverted submissions that there was no likely effect on the market for the original,' we conclude that . . . a silent record on an important factor bearing on fair use disentitle[s] the proponent of the defense'").

And the PMC Defendants fail to address at all that "if the challenged uses should become widespread, it would adversely affect the potential market for the copyrighted work." *See McGucken*, 42 F.4th at 1163. This is because there is no genuine dispute that (1) Vogts has received and granted requests from media publications to use his photos of properties in articles discussing those properties (*see* Dkt. 53-4 ¶¶ 3, 6, 8; Dkt. 54-2 at 22:19-21) and (2) *the PMC Defendants* regularly license photos for use in their articles from third parties and license their own photos to other media publications (Dkt. 53-4 ¶¶ 22-26, 47-50). Indeed, each of the posts at issue began with a "header photo" consisting of a *licensed photo* superimposed over one of the *unlicensed* Subject Photographs. *Id*. ¶¶ 51-52. There is, *at least*, a potential market for Vogts' photos that the PMC Defendants' unauthorized uses threatens.

To be sure, the PMC Defendants' unlicensed uses of the Subject Photographs caused actual *and* potential market harm because the photos were simply used to show what they show—i.e., because of "the limited extent to which [the PMC Defendants] transformed [Vogts'] works." *See McGucken*, 42 F.4th at 1164; *see also Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 308 (3d Cir. 2011) ("Murphy is a

professional photographer who engages in licensing of his work. If it were possible to reproduce his unaltered work, as a whole, without compensation under the guise of news reporting . . . it would surely have a 'substantially adverse impact' on his ability to license his photographs."); *contra* Dkt. 53-1 at 21.

Defendants' assertion that "there is no presumption of market harm for commercial uses" (*id*. at 22) misreads *Dr. Seuss* and is flatly wrong. *See* Dkt. 44 at 18:15-17, n.9. As this Court has explained, "it is well accepted that when the intended use is for commercial gain, the likelihood of market harm may be presumed." *BackGrid USA*, 2023 WL 2347082 at *9 (internal citations and quotations omitted).

Defendants also confusingly argue that Vogts "does not attempt to license his photographs of celebrity owned properties to the media" while acknowledging "instances where Vogts did authorize the media to use his photographs of celebrity owned properties[.]" *See* Dkt. 53-1 at 22-23.[7] Even so, this argument is of no consequence because a particular photo's licensing history, or the amount of time that has passed since a particular photo was licensed, does not make the "threat to the licensing market" any less substantial. *See Michael Grecco Prods., Inc. v. Livingly Media, Inc.*, No. CV200151, 2021 WL 2546749, at *11 (C.D. Cal. Apr. 16, 2021) (although plaintiff "never issued a prospective license for use through its site" and "[p]hotographs 2 and 3 were never licensed," "Livingly used the Photographs commercially by copying them essentially in their entirety," and "[a]llowing websites to post copyrighted material without a license merely because the market for the material has gone cold would pose a substantial threat to the licensing market").

---

[7] Underneath their attempt at distinguishing Vogts' prior licenses (Dkt. 53-1 at 22-23), which has no bearing on the *existence* of a market for property photos, the PMC Defendants do not genuinely dispute that media publications have previously sought and obtained Vogts' permission to use his photos of properties in articles discussing those properties or that Vogts could have negotiated licensing fees for those uses. That is making "the same use" of Vogts' photos "as the publications that obtained licenses[.]" *See McGucken*, 42 F.4th at 1163.

Defendants fault Vogts for not putting forth evidence "that [their] use resulted in lost licensing opportunities" (*see* Dkt. 53-1 at 21) but Vogts is under no such requirement. *See Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 81 (2d Cir.1997) (noting that plaintiff was not required to show a decline in the number of licensing requests for the work); *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 136, 144–46 (2d Cir. 1998) (finding fourth factor favored plaintiff, despite evidence that challenged secondary use did not diminish original work's profitability). The reality is that the PMC Defendants' uses of the Subject Photographs shows that there is a secondary market for those Photographs, and that "secondary market would be meaningless if entertainment websites could use the image without paying the licensing fee, even if few or no customers showed interest in the [work]"). *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 63–64 (E.D.N.Y. 2021). Vogts has the right to *try* to license his photos to media outlets *if he decides to do so*. *Otto*, 345 F. Supp. 3d at 432–33; *Castle Rock*, 150 F.3d at 145–46 ("Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works based on *Seinfeld*, . . . the copyright law must respect that creative and economic choice."). The PMC Defendants' conduct, if universalized, clearly undermines that right.

Finally, Defendants' umbrage at Vogts' argument that it "makes no difference' . . . that Vogts authorized the media to publish his photos [] for 'attribution, credit, and narrative control in lieu of revenue" (Dkt. 53-1 at 24) misses the point.[8] Vogts licensed his photos *in exchange for valuable consideration*, and the PMC Defendants' unauthorized uses robbed him of receiving a benefit in exchange for the use of his photos. *See, e.g.*, *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1300–01 (C.D. Cal. 1995) ("'[O]ne of the most commercially lucrative aspects

---

[8] Those licensing opportunities arose earlier in Vogts' career. "The creator of a work should not be precluded from future profits should they lack the marketing prowess to capitalize on their work at the time of creation." *Otto*, 345 F. Supp. 3d at 432.

of the copyrights is their value as lending social cachet and upscale image to cars' and [] Defendants' commercial unfairly usurps this benefit"); *Dr. Seuss*, 109 F.3d at 1403 ("The good will and reputation associated with Dr. Seuss' work is substantial . . . . [M]arket substitution is at least more certain, and market harm may be more readily inferred."). If all media publications act as the PMC Defendants have, Vogts will receive *nothing*—credit or otherwise—for the use of his photos. *See Brammer*, 922 F.3d at 268. That is a textbook example of universalized harm.

At bottom, permitting the unlicensed use of the Subject Photographs in cases like this will impair the actual and potential market for Vogts' photos. Vogts specifically reserved for himself the copyrights to his photos and the right to license them for the very types of secondary uses at issue in this case. This factor weighs heavily against a finding of fair use.

## III. CONCLUSION

The PMC Defendants ask this Court to find that they made fair use of the Subject Photographs, but not a single factor supports such a finding. The PMC Defendants' commercial uses of those 53 Photographs included no commentary or criticism on those Photographs or Vogts. Instead, the PMC Defendants used them merely to show what they show. That was gratuitous and impaired Vogts' ability to commercialize his photos in the well-established licensing market for photos *that the PMC Defendants participate in*. Therefore, this Court should find the PMC Defendants liable for infringing Vogts' copyrights in the Subject Photographs. Upon that adjudication, this case can proceed to trial on the only issues actually in dispute—willfulness and damages.

Respectfully submitted,

Dated: March 30, 2023

By: /s/ Stephen M. Doniger
Stephen M. Doniger, Esq.
Benjamin F. Tookey, Esq.
Attorneys for Plaintiff

**L.R. 11-6.2. Certificate of Compliance**

The undersigned certifies that this memorandum of points and authorities complies with the type-volume limitation of L.R. 11-6.1. This certification is made relying on the word count of the word-processing system used to prepare the document.

The undersigned, Plaintiff's counsel of record, certifies that this brief contains fewer than 7,000 words, and complies with the word limit of L.R. 11-6.

Dated: March 30, 2023 By: */s/ Stephen M. Doniger*
Stephen M. Doniger, Esq.