Stephen M. Doniger (SBN 179314)
stephen@donigerlawfirm.com
Benjamin F. Tookey (SBN 330508)
btookey@donigerlawfirm.com
DONIGER / BURROUGHS
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON VOGTS,<br><br>Plaintiff,<br><br>v.<br><br>PENSKE MEDIA CORPORATION; DIRT.COM, LLC; et al.,<br><br>Defendants. | Case No. 2:22-cv-01153-FWS-PVC<br>*Hon. Fred W. Slaughter Presiding*<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Final Pretrial Conference: June 15, 2023<br>Trial Date: July 11, 2023<br>Courtroom: 10D |

## I. CLAIMS AND DEFENSES

### A. Vogts will establish Defendants' liability for copyright infringement

Plaintiff Brandon Vogts will be pursuing claims of copyright infringement against Defendants Penske Media Corporation ("PMC") and Dirt.com ("Dirt") (collectively, the "PMC Defendants") regarding unauthorized uses of his 53 original photos of different aspects of three different properties (collectively, the "Subject Photographs") on dirt.com (the "PMC Defendants' Website"), in Dirt newsletters, in Dirt social media posts, and in content syndicated to PMC's other publications and third-party syndication partners. Vogts will also seek a finding of willful infringement.

The PMC Defendants do not contest, and have stipulated to the establishment of, the prima facie elements of Vogts' claims—ownership of valid copyrights in the Subject Photographs and their unauthorized copying thereof. Instead, Defendants claim fair use and, in the event their assertion of fair use fails and they are found liable, that they are innocent infringers and that Vogts is only entitled to three statutory damages awards instead of one award per individual Subject Photograph.

The elements of Vogts' copyright infringement claims are that (1) Vogts is the owner of a valid copyright; and (2) PMC and Dirt copied original expression from Vogts' copyrighted work. *See* 9th Cir. Model Civ. Jury Instr. No. 17.5 (2020).

#### 1. Vogts owns valid copyrights in the Subject Photographs

The parties conclusively stipulated that Vogts owns valid copyrights in the Subject Photographs. Dkt. 42.

Nevertheless, if and as necessary, Vogts will present evidence demonstrating that he holds valid copyrights in the Subject Photographs, and timely registered them with the U.S. Copyright Office under Reg. Nos. VA 2-213-119 (Subject

Photographs 1-20, *see* Ex. 1 at Dkt. 1-1), VA 2-227-873 (Subject Photographs 21-38), and VA 2-230-981 (Subject Photographs 39-53). Under 17 U.S.C. § 410(c), those registrations are prima facie evidence of the validity of the copyrights, including the originality of those Photographs, and there is no evidence to the contrary.

### 2. Defendants copied the Subject Photographs

Copying is established through evidence of access and substantial (if not striking) similarity. Access can be shown by proving one or more of the Defendants had an "opportunity to view or copy" the Subject Photographs. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 483 (9th Cir. 2000).

The parties conclusively stipulated that the PMC Defendants accessed and copied the Subject Photographs, and that should Vogts prove infringement they are jointly and severally liable. Dkt. 42.

As necessary and appropriate to demonstrate the scope of use (for damages purposes), Vogts may support this by introducing copies of the Subject Photographs displayed on the PMC Defendants' Website, newsletters, social media posts, and content syndicated to other PMC publications and third parties, as well as documentary evidence and testimony from PMC and Dirt regarding and showing the same. The PMC Defendants do not dispute that the above-referenced content displayed unauthorized, nearly verbatim copies of the Subject Photographs—which "can only be explained by copying, rather than by coincidence, independent creation, or prior common source." *Testa v. Janssen*, 492 F. Supp. 198, 203 (W.D. Pa. 1980).[1]

---

[1] *See also Stewart v. Wachowski*, 574 F. Supp. 2d 1074 (C.D. Cal. 2005) ("[T]o prove that certain similarities are 'striking,' plaintiff must show that they are the sort of similarities that cannot satisfactorily be accounted for by a theory of coincidence, independent creation, prior common source, or any theory other than that of copying. The similarities should be sufficiently unique or complex as to make it unlikely that both pieces were copied from a prior common source, [...] or

## B. The PMC Defendants' unauthorized copying was not fair use.

The PMC Defendants concede Vogts' prima facie infringement claims and abandon all affirmative defenses to liability other than fair use. The PMC Defendants bear the burden to prove that each secondary unauthorized use of the Subject Photographs was fair, and they have not argued that their unauthorized uses of the Subject Photographs in newsletters, social media posts, or syndicated content were fair—a concession that they are liable for those secondary uses. Thus, the only inquiry is whether their unauthorized uses of the Subject Photographs on the PMC Defendants' Website were fair.

In determining fair use, the trier considers (1) the purpose and character of the use, including whether such use is of a commercial nature; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These factors are analyzed and weighed "in light of the purposes of copyright." *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)). None of those factors weigh in favor of a finding of fair use.

### 1. The Defendants' commercial uses of the Subject Photographs were non-transformative.

The PMC Defendants displayed the Subject Photographs in for-profit posts on their Website as illustrations and visual representations of properties—exactly the purpose for which those Photographs were created. Those commercial uses are non-transformative, weighing heavily against fair use.

"[C]ommercial use is a factor that tends to weigh against a finding of fair use[.]" *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012). A use is

---

that the defendant was able to compose the accused work as a matter of independent creation.").

4

commercial when "the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561-62 (1985).

Vogts will present evidence that Defendants profited from the exploitation of the Subject Photographs without paying the customary price. The articles at issue were displayed for profit, and each of the Subject Photographs had a separate webpage which separately generated revenue for Defendants when viewed. And the use of photos like those at issue are customarily licensed by the PMC Defendants, including through its subscriptions to services including Associated Press and Getty Images, as well as other licenses for the use of photos in its articles that it has entered into with photographers. Indeed, the PMC Defendants superimposed three photos that they properly licensed over three of the unlicensed Subject Photographs. These were commercial uses.

And Defendants' use was non-transformative. "[T]he word 'transformative' . . . describe[s] a copying use that adds something new and important." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1203 (2021). The "benchmarks" of transformative use are "(1) further purpose or different character in the defendant's work, i.e., the creation of new information, new aesthetic, new insights and understanding; (2) new expression, meaning, or message in the original work, i.e., the addition of value to the original; and (3) the use of quoted matter as raw material, instead of repackaging it and merely superseding the objects of the original creation." *Dr. Seuss*, 983 F.3d at 453; *Monge*, 688 F.3d at 1175; *Campbell*, 510 U.S. at 579-80. The Defendants used the Subject Photographs for exactly the purpose for which they were taken: to depict the properties. When a copyrighted work is used simply to illustrate what that work already depicts, there is no "further purpose or different character." *Campbell*, 510 U.S. at 579; *Barcroft Media, Ltd. v. Coed Media Grp.*, LLC, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (online article

not transformative where photos were used as "illustrative aids" depicting subjects described in article).

Vogts will present evidence that the Subject Photographs were displayed on the PMC Defendants' Website in galleries with no text. And even the text sides of the articles at issue failed to credit or otherwise identify Vogts as the source of the Subject Photographs, or otherwise treat as the story, comment on, or critique Vogts himself or the Subject Photographs themselves.

The PMC Defendants' claim that Vogts took the Subject Photographs to sell the depicted properties, while they used them to show how celebrities live, is simply not true. Admittedly, the purpose of the real estate listings in which the Subject Photographs were initially used was to facilitate the sale, purchase, or lease of properties. But the purpose for which the Subject Photographs were used in those listings was to show those properties. Similarly, while the articles discussed the real estate transactions (because they involved "celebrities"), they also used the subject Photographs to show the properties involved in those transactions—the exact same purpose.

Importantly, the articles do not even suggest that the Subject Photographs show how "celebrities" live, and there is no evidence that the Subject Photographs even capture the depicted properties as the "celebrities" lived in them—as opposed to homes staged for sale by real estate agents. This is especially so with regard to the property depicted in Subject Photographs 39-53, as the individual that was the subject of the article (Zak Williams) was the buyer and thus the property shown in the listing could not have shown how he lived.

Defendants' argument that their use of the Subject Photographs was transformative lacks any supporting evidence. This factor weighs against fair use.

### 2.     The Subject Photographs are original, creative works.

The second fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). In assessing a copyrighted work's nature, courts consider the

extent to which it is creative and whether it is unpublished. *McGucken*, 42 F.4th at 1161. "[F]air use is more difficult to establish when [creative] works are copied." *Dr. Seuss*, 109 F.3d at 1402. "Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003).

Vogts will offer testimony at trial that the Subject Photographs were the product of his creative decisions. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019) (holding that photos of residences were creative because they were "aesthetically and creatively shot and edited by professional photographers"). Such testimony establishes that the Subject Photographs are "entitled to strong protection, weighing against fair use." See *Werner*, No. 2021 WL 3560588 at *4–5.

And while Vogts' Subject Photographs had been published (with limited authorization) on MLSs, that does not weigh in favor of fair use. An author does not lose the right to control future publication of the work simply because the work has been published before. This weighs against fair use.

### 3. The Defendants displayed nearly verbatim reproductions of the Subject Photographs even though they publish posts on their Website without photos.

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." See 17 U.S.C. § 107(3) (emphasis added). This inquiry is concerned with "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. As such, this factor weighs against fair use when the infringer publishes "the heart" of an "individual copyrighted picture" without justification, or when "a substantial portion of the infringing work was copied verbatim from the copyrighted work." *McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1178; *Campbell*, 510 U.S. at 587.

Here, the PMC Defendants took "the heart" of each of the Subject Photographs by copying Vogts' Subject Photographs essentially verbatim (but for cropping of watermarks). "[C]opying an entire work militates against a finding of fair use." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000).

Relatedly, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material." *McGucken*, 42 F.4th at 1162 n.6; *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997). The PMC Defendants' use of a significant portion of the Subject Photographs (i.e., essentially verbatim copies) is easily apparent. Plus, users of the PMC Defendants' Website could zoom in on the high-resolution reproductions of the Subject Photographs in the galleries and make them larger.

And even after the Defendants removed the Subject Photographs from the posts at issue, those posts remain up, advertisements still appear alongside them, and they continue to generate page views and revenue. The PMC Defendants' copying was simply "far more than was necessary." *See McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1179. This weighs against fair use.

### 4. If universalized, the Defendants' uses would destroy an established licensing market for the use of property photos in articles discussing those properties.

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor encompasses both (1) "the extent of market harm caused by the particular actions of the alleged infringer," and (2) "'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original" and "the market for derivative works." *McGucken*, 42 F.4th at 1163; *Dr. Seuss*, 983 F.3d at 458.

Vogts will present evidence that there is a well-established licensing market for photos to be used in media articles like those at issue, and that he has received requests from media publications to use his photos of properties in articles discussing those properties—and in response has granted limited licenses to those publications to use those photos pursuant to specific terms.

*   *   *

None of the fair use factors favors a finding of fair use.

### C. Vogts will establish that the PMC Defendants willfully infringed his copyrights in the Subject Photographs

Infringement is willful when it is committed either knowingly or with reckless disregard of the copyright holder's rights. *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008); *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 944 (9th Cir. 2011); *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019) ("[A]ctual knowledge, willful blindness, [and] recklessness[] [are] the three mental states that properly support a finding of willfulness.").

Vogts will present evidence that the PMC Defendants initially acted with at least reckless disregard for, and/or willful blindness to, his copyrights, and then further acted willfully by continuing to display the Subject Photographs after being specifically and repeatedly advised of their infringing conduct. A non-exhaustive list of the evidence Vogts will show is below:

- The PMC Defendants continued to display Subject Photographs 1-20 and 21-38 on their Website until February 2022 (i.e., when this case was filed), even though they received a cease-and-desist letter from Vogts in September 2021 and admitted that they read and understood the letter; and despite Vogts notifying them again in October 2021 that those Photographs continued to be displayed.

- PMC knows that photos are entitled to copyright protection and not free to download from the Internet and use. It is one of the largest digital media and publishing companies in the world, and is a party to sophisticated licensing agreements with high-profile media companies and publications (including Getty and AP), including to license out its own massive archive of copyrighted photos. Indeed, the terms of use for the PMC Defendants' Website explicitly states that downloading and reproducing the content on that Website, notably including PMC's photos and the photos it/Dirt licenses from Getty Images (and before Getty, AP), is expressly prohibited and is a copyright violation.
- PMC maintains and enforces its rights in its own massive portfolio of copyrighted photos, and obtains authorization to use third-party copyrighted photos in its own content (as does Dirt). In fact, in September 2020—i.e., at essentially the same time as when the PMC Defendants published the posts on their Website displaying Subject Photographs 1-20 and 21-38—PMC filed a copyright infringement lawsuit against Shutterstock, Inc. for the unauthorized exploitation of 2,300 of PMC's copyright photos on Shutterstock's website. PMC called Shutterstock's assertion of fair use "frivolous": "Shutterstock's conduct fails all four fair use factors: (1) displaying PMC's photos on its website constitutes a 'commercial' and non-transformative use; (2) the works in question are original, creative photographs; (3) Shutterstock displayed the images in their entirety; and (4) Shutterstock's use usurps the licensing market for those photographs." *See Penske Media Corporation v. Shutterstock, Inc.*, Case No. 1:20-cv-04583, Dkt. 45 at 17-18.
- Mr. McClain, the author of the post displaying Subject Photographs 39-53, has previously worked with real estate photographers, has obtained

permission to use their photos in articles, and has credited them in articles in connection with those photos.

- Mr. McClain did not consider fair use at all, or conduct any fair use analysis whatsoever, before publishing that post.
- Mr. McClain has never been told by PMC that he needs to secure permission to use third-party copyrighted photos or been given any other policies or guidance regarding the use of third-party content in articles on Dirt.com.
- Mr. Voss will affirmatively seek permission to use photos in his articles on the PMC Defendants' Website, but did not do so here simply because he did not think the articles would be big enough to warrant it.
- Defendants copied the Subject Photographs from redfin.com and realtor.com, both of which have terms of use explicitly stating that copying photos from those websites is expressly prohibited and is a copyright violation. Mr. Voss has admitted that he understands that redfin.com and realtor.com are only able to display photos pursuant to licenses obtained from MLSs.
- Redfin.com and realtor.com have twice contacted Mr. Voss and Mr. McClain notifying them that they cannot display photos on the PMC Defendants' Website with MLS watermarks. Instead of properly clearing rights in photos, Mr. Voss and Mr. McClain simply began cropping those watermarks out.
- Mr. Voss and Mr. McClain each claim that they have never read the terms of use for either redfin.com or realtor.com. Mr. McClain assumed he could download and reproduce photos he copied from those websites because he saw other publications doing that (including PMC's own *Variety*), but he never reached out to anyone (internal or external to PMC and its portfolio of brands) to test his assumption.

### D. Vogts will likely seek statutory damages, and will be entitled to 53 awards (one per Subject Photograph)

A copyright owner is entitled to recover "an award of statutory damages for all infringements involved in the action, with respect to any one work[.]" 17 U.S.C. § 504(c)(1); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193–94 (9th Cir. 2001) ("[E]ach work infringed may form the basis of one award."). Section 504(c)(1) also provides that "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). "Although the Copyright Act does not define the term 'work,' courts approach the definition depending on the specific issue, for example, . . . calculating statutory damages." *Monge*, 688 F.3d at 1180 n.10.

Different circuits have historically applied different approaches in interpreting what constitutes a "work" or a "compilation" for purposes of Section 504(c)(1). The Second and Fourth Circuits have looked at the available commercial promotion or distribution of each work as well as how each work is registered.[2] And the First, Ninth, Eleventh, and D.C. Circuits have applied a "functional test" to determine whether each work has "independent economic value."[3] However, in *VHT*, 918 F.3d at 747–48, a case also involving the unauthorized use of property photos on a commercial website, the Ninth Circuit clarified that those inquiries are non-dispositive factors that "inform[] our analysis" of determining the number of statutory damages awards for "the photo[s]" at issue, and that "[u]ltimately, what counts is the statutory definition." *Id*.

---

[2] *See Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003).

[3] *See Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116-17 (1st Cir. 1993); *Columbia Pictures Television, Inc. v. Krypton Broad. ("Columbia Pictures I")*, 106 F.3d 284, 295 (9th Cir. 1997); *Columbia Pictures II*, 259 F.3d at 1193; *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990); *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996).

A "compilation" is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Thus, when an author creates a number of different works and turns them over to a client for use, those works do not lose their protection as individual works and do not become a "compilation" unless they are "selected coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."

The evidence in this case will show nothing more than that Vogts turned over works to his clients for use however they wished. They were not selected, coordinated, or arranged "in such a way that the resulting work as a whole constitutes an original work of authorship." Indeed, there is no evidence in this case that any photos were coordinated or arranged by Vogts in any way, or that the PMC Defendants copied the same coordination or arrangement that Vogts' clients employed.

Vogts will also present evidence that the 53 individual Subject Photographs were registered as individual works on Copyright Office Form VAs with multiple other unrelated photos. Registration VA 2-213-199 covers 187 individual photos of six unrelated properties, 44 of which—including Subject Photographs 1-20—depict different aspects of a property located at 601 Seclusion Lane. Registration VA 2-227-873 covers 558 individual photos of 15 unrelated properties, 36 of which—including Subject Photographs 21-38—depict different aspects of a property located at 713 North Alta Vista Boulevard. And Registration VA 2-230-981 covers 544 individual photos of 23 unrelated properties, 26 of which—including Subject Photographs 39-53—depict different aspects of a property located at 4047 Dixie Canyon Avenue. Thus, the Subject Photographs were registered as individual photos on group registrations of numerous unrelated

property photos taken and published on different days, not as compilations or collections.

The number of copyright violations, and thus the number of statutory damages awards, turns on the nature of the "works infringed" by the Defendants, not the issuance of those works. See *VHT I*, 918 F.3d at 747-48 (stating that VHT's "damages award hinges on whether VHT's photos used on Digs are part of a 'compilation' or if they are individual photos"). Thus, the proper inquiry is whether or how the Subject Photographs—the particular photos that the PMC Defendants downloaded, displayed, and distributed—are selected, coordinated, or arranged (if at all). The fact that Subject Photographs 1-20, 21-38, and 39-53 were respectively licensed together through one invoice and download link does not mean that each individual photo cannot stand alone. See *MCA Television*, 89 F.3d at 768–70 ("[T]he decision of a distributor of television programs to sell television series as a block, rather than as individual shows, in no way indicates that each episode in a series is unable to stand alone."). There is no precedent, and the PMC Defendants provide none, suggesting that making individual photos available for download in a single folder makes each photo inviable on its own.

Vogts will also present evidence that each Subject Photograph is a distinct work that has its own independent economic value. See *VHT, Inc. v. Zillow Grp., Inc.*, 461 F. Supp. 3d 1025, 1043-44 (W.D. Wash. 2020) ("If VHT's images . . . [have] independent economic value[], . . . they cannot be a 'compilation[.]'"); *Monge*, 688 F.3d at 1179–80 (finding that "[e]ach of the individual wedding photos" had independent economic value). Vogts will present evidence that the photos of different aspects of 601 Seclusion Avenue, 713 North Alta Vista Boulevard, and 4047 Dixie Canyon Avenue—including the Subject Photographs—are available for licensing on per-photo and per-property bases. Licensees can then determine the best way to market those properties in whatever selection, coordination, arrangement, grouping, or order they prefer. Thus, those photos—

including the "subset" thereof which is the Subject Photographs (for no reason other than that they are the particular photos that the Defendants chose to copy)—cannot fairly be termed compilations under the statutory definition.

This case is a prime example of "[a] possibility Congress made available in § 504(c)(1)"—i.e., "a situation where a copyright holder encounters infringement on multiple works available in the market as a group but where discernable value lies at the level of a particular individual work—for example, at the level of a particular photo." See *Sullivan*, 936 F.3d at 571–72.

In *Playboy Enterprises Inc. v. Sanfilippo*, No. 97-0670, 1998 WL 207856 at *5 (S.D. Cal. Mar. 25, 1998), the court held that the copyright holder could recover separate awards for each photo at issue because "[t]hese images are subject to re-use and redistribution in accordance with various licensing arrangements . . . . The fact that many of these images appeared together should not detract from the protection afforded to each individual effort." And in *VHT*, the court held that property photos licensed on a per-photo or per-property basis are eligible for separate awards in part because they "are akin to the television episodes in *Twin Peaks*." 461 F. Supp. 3d at 1045; *see Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1380–81 (2d Cir. 1993) ("The author of eight scripts for eight television episodes is not limited to one award of statutory damages just because he or she can continue the plot line from one episode to the next[.]").

"[A] protected work has standalone value if the evidence shows that work has distinct and discernable value to the copyright holder." 6 Patry on Copyright § 22:185. The evidence will show that Vogts' photos, including the Subject Photographs, are available for licensing on a per-photo basis, among numerous other licensing arrangements. *See Cormack v. Sunshine Food Stores, Inc.*, 675 F. Supp. 374, 376 (E.D. Mich. 1987) ("[B]usinesses could find a use for one of the tests but not the other[.]"). And Vogts' website offers viewing access to his photos individually and by their characteristics, not by property. *See Grady v. Nelson*, No.

12-CV-03004, 2014 WL 7143852, at *8–9 (D. Colo. Dec. 15, 2014) ("Plaintiff offers viewing access to photographs and videos on an individual basis to members of his website[.]").

Finally, Vogts will present evidence that the PMC Defendants treated the Subject Photographs "as separate entities" in this case, and that each Subject Photograph generated revenue for them. For example, the PMC Defendants themselves publish posts about single rooms in properties—i.e., the kitchen or the office—for which they only display one photo of each selected property which shows that room. The PMC Defendants' selective use of certain photos—i.e., particular photos they chose from the available photos on the realtor.com and redfin.com listings—and not others shows the disingenuousness of the PMC Defendants' argument that they merely infringed three compilations.

Based on the above, Vogts will seek 53 statutory damages awards.

### E. Vogts will seek his costs and attorneys' fees

Vogts will seek his costs and attorneys' fees incurred in connection with prosecuting this case. Section 505 of the Copyright Act authorizes an award of attorneys' fees to the prevailing party as part of its costs. 17 U.S.C. § 505. The factors considered in determining whether to award costs and fees include "(1) the degree of success of obtained, (2) frivolousness, (3) motivation, (4) the objective unreasonableness of the losing party's factual and legal arguments, and (5) the need, in particular circumstances, to advance considerations of compensation deterrence." *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1229 (9th Cir. 1997).

All of these factors militate in favor of an award of costs and fees to Vogts. Vogts' sole motivation has been to protect his proprietary Subject Photographs, while Defendants' motivation was to profit off of Vogts' investment and intellectual property. A finding of willfulness is not required to justify an award of

attorneys' fees. *See Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 560 (9th Cir. 1997). This issue will be the subject of post-trial motion practice.

### F. Evidentiary issues

Vogts will move in limine to preclude the PMC Defendants from rehashing an element of Vogts' prima facie claim that they already stipulated has been conclusively established, and to preclude the PMC Defendants from testifying at trial to matters they claimed in discovery were privileged.

In discovery, the PMC Defendants testified to, at any relevant time, a lack of any formal written policies regarding clearing or using third-party copyrighted content on the PMC Defendants' Website or in *Variety* (the PMC publications from which "Dirt" spun off). Yet Dirt's 30(b)(6) representative refused to testify regarding whether or to what extent he had been advised or trained regarding the clearance and use of third-party copyrighted photos in articles on the ground that such information was privileged because the only such advice or training came from attorneys. Since it is well settled that parties may not wield privilege as both a sword and shield, and because it would be fundamentally unfair for the PMC Defendants to testify at trial as to training they received regarding clearing and using copyright content after refusing to provide that information in discovery, Vogts moves to preclude any such testimony.

The PMC Defendants have also indicated an intent to question Vogts about whether his Subject Photographs include other content in which third parties have copyrights. Vogts' testimony was that he was unaware of any such content, and the PMC Defendants have presented no evidence that any content in any Subject Photograph contains copyright-protected work by anyone but Vogts. Moreover, the parties have stipulated that Vogts owns valid copyrights in his Subject Photographs, so there is no issue of whether those Photographs are unauthorized derivative works. The PMC Defendants apparently seek to put Vogts on the defensive by arguing that he has not fairly considered others' copyrights, and/or by

challenging the originality of his asserted works. But there is no such evidence, and such a reference is irrelevant to any issue in dispute and threatens to unfairly prejudice Vogts, confuse and mislead the jury, and result in an undue consumption of time. Vogts therefore moves to preclude any such questioning or argument.

Finally, the parties conferred about a potential motion in limine to preclude any reference to any other lawsuits filed by Vogts to enforce his copyrights. The parties have agreed that neither party will mention any other claims by or involving Vogts, including settlement agreements reached on those claims, and that the PMC Defendants will not refer to Vogts by such terms as "copyright troll," "prolific copyright litigant," etc. Though this should not be an issue, Vogts nonetheless wants to make the Court aware of the matter and agreement.

### G.     Bifurcation

Neither party has requested bifurcation.

### H.     Jury Trial

The parties have requested a jury trial.

### I.     Attorneys' Fees

Vogts will seek reimbursement of the costs and attorneys' fees he has incurred prosecuting his copyright infringement claims.

### J.     Abandonment of Issues

Because the parties stipulated that if one or both of the PMC Defendants are found liable they will be jointly and severally liable (Dkt. 42), Vogts will not be pursuing his claims of contributory or vicarious copyright infringement.

Respectfully submitted,

Dated: May 11, 2023            By:     */s/ Stephen M. Doniger*
                                       Stephen M. Doniger, Esq.
                                       Benjamin F. Tookey, Esq.
                                       DONIGER / BURROUGHS
                                       Attorneys for Plaintiff