# Exhibit G

| | |
|---|---|
| 1 | Bryan J. Freedman (SBN 151990) |
| | bfreedman@ftllp.com |
| 2 | Sean M. Hardy (SBN 266446) |
| | smhardy@ftllp.com |
| 3 | FREEDMAN + TAITELMAN, LLP |
| | 1901 Avenue of the Stars, Suite 500 |
| 4 | Los Angeles, California 90067 |
| | Telephone: 310-201-0005 |
| 5 | Facsimile:  310-201-0045 |
| 6 | |
| | Attorneys for Plaintiffs Penske Media Corporation |
| 7 | and Variety Media, LLC |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PENSKE MEDIA CORPORATION, a Delaware corporation; VARIETY MEDIA, LLC, a Delaware limited liability company, | ) ) ) ) ) | Case No. 2:15-cv-06822 AJW |
| Plaintiffs, | ) ) ) | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | ) ) ) | **(1) DECLARATORY JUDGMENT [28 U.S.C § 2201]** |
| FREEPLAY MUSIC, LLC, a Delaware limited liability company, and DOES 1 through 5, inclusive, | ) ) ) ) ) | **(2) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)** |
| Defendants. | ) ) ) ) ) ) | |

Plaintiffs Penske Media Corporation ("PMC") and Variety Media, LLC ("Variety") (collectively, "Plaintiffs") allege as follows:

### NATURE OF THE ACTION

1.     This is a civil action seeking a declaratory judgment that Plaintiffs' use of portions of certain musical works on the website YouTube does not constitute infringement of the copyright bearing the United States Copyright Registration Number SR000033720 (the "Copyright").

2. This case arises out of copyright litigation threats Defendant Freeplay Music, LLC ("Freeplay" or "Defendant") made against Plaintiffs through its agent, TuneSat, LLC ("TuneSat").

3. Freeplay's threats were intended to cause Plaintiffs to pay Freeplay a monetary sum that far exceeded any actual value of the Copyright, which Freeplay made available for "free" download to the general public on its website. Plaintiffs now seek a declaratory judgment that their use of the musical works at issue do not constitute infringement of the Copyright. Plaintiffs further seek restitution and injunctive relief under California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL"), as Freeplay's actions described herein constitute unfair competition under the UCL.

## THE PARTIES

4. PMC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Los Angeles, California.

5. Variety is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Los Angeles, California.

6. Upon information and belief, Freeplay is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

7. Defendant DOES 1 through 5, inclusive, are sued herein under fictitious names. When their true names and capacities are ascertained, Defendants will amend this complaint by inserting their true names and capacities herein.

8. On information and belief at all times material herein each of the defendants was the agent and employee of some or all of the other defendants, and

in so doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

## JURISDICTION AND VENUE

9. This action is brought, and this Court has subject matter jurisdiction, pursuant to 28 U.S.C. Sections 1331, 1338, and 2201. This Court has federal question jurisdiction in this matter in that Plaintiff seeks a declaration of rights under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

10. Additionally, this Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. Section 1367 and California Business and Professions Code Section 17200 *et seq.*, specifically California Business and Professions Code Section 17203, which provides any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction; and the court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and California Business and Professions Code Section 17204, which provides for actions for any relief pursuant to the Unfair Competition Law to be prosecuted exclusively in a court of competent jurisdiction by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.

11. Venue lies within this Court pursuant to 28 U.S.C. Sections 1391(b)(2)-(3) in that Defendant is subject to the personal jurisdiction of this Court in this Judicial District. Specifically, Defendant has substantial, continuous and systematic contacts with California in that Defendant directly targets business activities towards consumers and competitors in California and causes harm to

3

**FIRST AMENDED COMPLAINT**

EXHIBIT G

VOGTS000723

Plaintiffs' business within this District through at least the operation of Defendant's fully interactive Internet website.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

12. Freeplay chose its name in an effort to mislead the public that the music on its website is available for "free." In fact, when a user enters a simple Google search for "free music," Freeplay is one of the first websites to come up. Upon entering Freeplay's homepage, the user is met with a block of large text which prominently states that Freeplay offers "FREE MUSIC FOR YOUTUBE AND <u>MORE</u>." After luring in unsuspecting persons with the promise of "free" music, Freeplay then encourages these persons to use the music, including in their own YouTube videos. After the consumer follows Freeplay's advice, Freeplay then traps the user by demanding that the consumer pay outrageous "license fees" for the use of music that was supposedly "free." Unlike most content owners, once a person uses Freeplay's music in a fashion Freeplay deems to be "illegal," Freeplay does not simply issue a takedown notice and request that the user remove the content. Instead, Freeplay sends the user a shakedown demand, threatening litigation if the consumer does not pay Freeplay an outrageous "license fee." These shakedown demands are typically made by TuneSat – ostensibly a third party "monitoring" the web for supposed infringement on behalf of Freeplay. In fact, both TuneSat and Freeplay were founded by Scott Schreer, the current CEO of both. Both TuneSat and Freeplay coordinate with one another in this deceptive scheme perpetrated on content creators. Furthermore, in making these outrageous demands, Freeplay refuses to identify to the target of the shakedown all of the allegedly infringing content. This is not how a business that wishes to legitimately license and protect its content would behave. But Freeplay is not really in the content license business, as the facts alleged below make clear.

13. Plaintiffs are in the business of providing media content to consumers. They do so, in part, through the operation of a channel on the media

4

**FIRST AMENDED COMPLAINT**

EXHIBIT G

VOGTS000724

sharing website YouTube. Through this YouTube channel, Plaintiffs provide multi-media news content to users of YouTube. Under the UCL, Plaintiffs are competitors of Freeplay.

14. Freeplay is also in the business of providing online media content to consumers. As its name inherently suggests, Freeplay markets itself as offering "free" music for download to consumers. The reality is far different. Freeplay is actually a for-profit enterprise. It entices unsuspecting members of the public to download its music, by claiming the use of such music is "free" – including, specifically, the use of such music on YouTube. After the user has downloaded the music and used it in virtually any manner, Freeplay contacts the consumer and demands a license fee for the allegedly unauthorized use of copyrighted material. Had Freeplay engaged in truthful advertising, and been upfront to the user regarding these "license fees," it is highly doubtful the user would have utilized this "free" music in the first place.

15. On information and belief, Freeplay's business model is structured upon this misleading "bait and switch" scenario. On information and belief, Freeplay generates a significant portion of its revenue through its aggressive license fee demands, coupled with threats of copyright infringement litigation. Consumers, caught completely unaware, are squeezed into paying Freeplay – typically for far more than Freeplay would have charged for a license in the first place. Consumers, including struggling artists and musicians, drawn to Freeplay by the promise of "free" music, generally lack the financial wherewithal to seriously challenge Freeplay's shakedown tactics.

16. Freeplay's deception of consumers is woven throughout its highly interactive website. Freeplay encourages users to download its "free" music and use the music in their own YouTube videos. Freeplay even offers a tool on its website to assist consumers in the creation of new videos using Freeplay's music. However, in or about October 2014, Freeplay unilaterally altered its confusing and

contradictory "terms and conditions" of use – prohibiting the free use of its music on YouTube. On information and belief, following this sudden change, Freeplay began issuing monetary demands to numerous consumers who had uploaded media on YouTube – media that allegedly contained music subject to Freeplay's copyright.

17. Moreover, following October 2014, Freeplay began issuing aggressive demands to numerous operators of YouTube channels – entities that had never subscribed to Freeplay's service, downloaded Freeplay's music, or otherwise agreed to any of Freeplay's terms and conditions.

## **FREEPLAY'S THREATS AGAINST PLAINTIFFS**

18. Plaintiffs are in the business of providing news and media content to consumers. In and around June 9, 2015, Freeplay's agent, TuneSat, sent an e-mail to Plaintiffs. The e-mail identified several alleged uses by Plaintiffs, through YouTube videos, of "copyrighted music owned and controlled" by Freeplay. Specifically, this music consisted of two songs, titled "Love Doctor" and "Funky Dan," which both appeared on the album, "Acid Jazz Volume 1." The e-mail threatened, among other things, that if the matter could not be resolved to Freeplay's satisfaction, "we will be forced to treat this matter as an infringement of our client's copyrights and we will consider all available options and remedies to resolve this matter." The e-mail further provided that, "the mere removal of the identified links or other content will not resolve the infringements that have already occurred."

19. TuneSat's June 9, 2015 e-mail did not reach Plaintiffs until in and around June 18, 2015, when TuneSat forwarded it to Plaintiffs' general counsel. On June 19, 2015, Plaintiffs took action to remove from public viewing the 61 YouTube videos TuneSat had identified. The primary purpose of these 61 YouTube videos was to convey criticism, commentary, and news reporting related to the entertainment industry. Any use of the material subject to the Copyright in

6

these 61 YouTube videos was *de minimis*. The content of the June 9, 2015 email informed Plaintiffs that the removal of the videos alone would not dispel the threat of litigation. Unless a monetary payment was made to Freeplay, Plaintiffs understood they would be sued for copyright infringement. Following the receipt of the June 9, 2015, email, Plaintiffs' general counsel gained knowledge of Freeplay's history of copyright infringement litigation. Plaintiffs also discovered that only a single copyright, the Copyright, existed for "Acid jazz: vol. 1."

20. On August 11, 2015, TuneSat attorney Michelle Ozog sent Plaintiffs an e-mail, stating that the "videos at issue" "seem to remain of an unlicensed and infringing nature." Although only two of Freeplay's songs, and a single copyright, were at issue, Freeplay demanded $60,000 to settle its "infringement claims." The fact that this matter had been referred to an attorney strongly impressed upon Plaintiffs that Freeplay would imminently commence litigation if its monetary demands were not met.

21. After researching the issue, Plaintiffs determined Freeplay's settlement demand was patently unreasonable and outrageous, and that the true value of Freeplay's copyright was only a few hundred dollars. Plaintiffs considered settlement discussions with Freeplay, via TuneSat, to be over at this point. Several weeks later, on September 2, 2015, Plaintiffs sent attorney Ozog an e-mail, flatly rejecting the $60,000 demand and outlining the reasons why, in Plaintiffs' view, it was "outrageous."

22. Accordingly, Plaintiffs' dilemma remained. They could do nothing and be sued, or accede to Freeplay's extraordinary demands. In order to forestall potential damages, Plaintiffs filed this action on September 2, 2015.

### **FREEPLAY'S HISTORY OF LITIGATION**

23. Pursuant to Freeplay's numerous threats, Plaintiffs reasonably fear that Freeplay will sue them based on their prior use of the Copyright in their YouTube videos, even though such videos are no longer viewable by the public.

After receiving Freeplay's litigation threats, Plaintiffs researched and became aware of Freeplay's extensive history of filing suit against alleged copyright infringers. Freeplay's extensive history of litigation includes, but is not limited to:

- The March 3, 2015 counterclaim of Freeplay in the U.S. District Court for the Central District of California case entitled *Collective Digital Studio, LLC v. Freeplay Music, LLC et al.*, Case No. 15-CV-00936-JFW, ECF No. 15 (C.D.Cal. Mar. 3, 2015) (PACER).

- The March 3, 2015 counterclaim of Freeplay in the U.S. District Court for the Central District of California case entitled *Machinima, Inc. v. Freeplay Music, LLC et al.*, Case No. 15-CV-00937-MRW, ECF No. 16 (C.D.Cal. Mar. 3, 2015) (PACER).

- The February 17, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Broadband TV Corp.*, Case No. 1:15-cv-01121-AT, ECF No. 1 (S.D.N.Y. Feb. 17, 2015) (PACER).

- The February 17, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Awesomeness, LLC, et al.*, Case No. 1:15-cv-01119-GBD-HBP, ECF No. 1 (S.D.N.Y. Feb. 17, 2015) (PACER).

- The February 17, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Maker Studios, Inc.*, Case No. 1:15-cv-01122-PGG, ECF No. 1 (S.D.N.Y. Feb. 17, 2015) (PACER).

- The May 19, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Intellitek, Inc.*, Case No 1:15-cv-03866-KPF, ECF No. 1 (S.D.N.Y. May 19, 2015) (PACER).

- The May 20, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Adams Chevrolet, Inc.*, Case No 1:15-cv-03889-RA, ECF No. 1 (S.D.N.Y. May 20, 2015) (PACER).

- The June 24, 2015 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Accessible Technologies, Inc.* Case No 1:15-cv-04944-AJN, ECF No. 1 (S.D.N.Y. Jun. 24, 2015) (PACER).

- The December 10, 2014 complaint of Freeplay in the U.S. District Court for the Southern District of New York case entitled *Freeplay Music, LLC v. Liberty Helicopters, Inc.* Case No 1:14-cv-09758-PAE, ECF No. 1 (S.D.N.Y. Jun. 24, 2015) (PACER).

24. Freeplay has failed and refused to provide any covenant not to sue Plaintiffs based on their prior use of the Copyright. In the absence of such a covenant, Plaintiffs face the danger of imminent suit absent a declaratory judgment that they do not, and have not, infringed upon the Copyright.

## FREEPLAY'S ACTS OF COPYRIGHT MISUSE

25. Freeplay has engaged a series of deliberate and unlawful false and misleading representations that its music is "free" to use on YouTube videos.

26. Individual YouTube users who are lured by Freeplay's representations of "free" music for their YouTube videos have the opportunity to

1 browse Freeplay's catalog on its website. This catalog is also directly accessible
2 from Google, without having to navigate first to Freeplay's homepage.
3     27. After browsing Freeplay's catalog and listening to samples, the user
4 has the option to select "Add to Cart" with respect to any song. Upon checkout,
5 the user is prompted to select from a dropdown menu of license options. Two of
6 these options are "YouTube: Personal use on YouTube only" and "Internet:
7 Personal Use (YouTube only)." The cost of both of these categories of licenses is
8 zero.
9     28. Whichever option the user selects, a popup window appears for a
10 "Master Recording / Synchronization License" (the "License"). Section 4 of the
11 License sets forth the permitted uses as follows:

12 • If the consumer selects the option for "YouTube: Personal use on
13 YouTube only," the License permits "YouTube Personal use on YouTube
14 only."

15 • If the consumer selects the option for "Internet: Personal Use (YouTube
16 only)," the License permits "Internet Personal Use (Youtube only)."

17     29. In either case, "personal use" on YouTube is expressly permitted. For
18 both options, the License gives the consumer no indication that an individual's use
19 of a song on YouTube is anything other than a permitted "personal use." Indeed,
20 "personal use" is not defined anywhere in the License. The License does not
21 incorporate any other terms by reference, nor does it offer a link to any other terms
22 extraneous to the License.

23     30. After the License is shown, all the user has to do to download the
24 music and obtain the "free" license is to enter an email address and click his or her
25 acceptance of the License. The license and download transaction takes place
26 directly on Freeplay's website.
27     31. If an individual user has any reason to question what a "personal use"
28 on YouTube is, s/he can navigate to the FAQ section of Freeplay's website

10

**FIRST AMENDED COMPLAINT**
EXHIBIT G

VOGTS000730

(http://www.freeplaymusic.com/faq.aspx) for clarification. There, Freeplay explains as follows:

**Is any of the music on FPM free?**

Yes. True to our name - all of the tracks in the Freeplay Music library are available to download for free in the following specific circumstances:

Youtube: All Freeplay Music tracks are available for free use on Youtube for PERSONAL USE, however Freeplay Music and YouTube retain the right to insert ads in any manner on, before, or otherwise connected to your video when posted on YouTube or any other YouTube-based platform. Businesses need to purchase a YouTube license for business.

32. If the user has made it to the FAQ section of Freeplay's website (and s/he has no need or reason to), this clarification would end all doubt that an individual's use of a Freeplay song on a YouTube video is permitted, and free.

33. It is only in the fine print of Freeplay's "Terms of Use" that Freeplay purports to disclose that a permitted "personal use" on YouTube is, in fact, extremely limited. Crucially, these "Terms of Use" are *not* part of the License to which the user agrees to be bound when downloading Freeplay's music. Nor does the user otherwise agree to be bound by these "Terms of Use" with any manifestation of assent, in any form.

34. Just as importantly, at no point in the process of downloading Freeplay's music is the user prompted or required to read these "Terms of Use." It is not surprising then that many, if not most, of the users who download Freeplay's music are not aware that the fine print of Freeplay's unilateral "Terms of Use" purports to exclude free use by individuals on YouTube.

35. Upon information and belief, Freeplay's website and License terms have changed since its inception. Upon information and belief, at all relevant

11
**FIRST AMENDED COMPLAINT**

VOGTS000731
EXHIBIT G

times, Freeplay has falsely, deceptively and misleadingly represented that its music was "free" to use.

36. Because of the powerful draw of "free" products and services on consumers, virtually every level of government has promulgated rules, regulations and guidelines that specifically prohibit false and misleading representations concerning "free" offers of the type Freeplay has made.

37. The Federal Trade Commission, for example, has promulgated a "Guide Concerning the Use of the Word 'Free' and Similar Representations." That Guide explains: "Because the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived." 16 C.F.R. § 251.1(a)(2). The Guide thus provides: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood." *Id.* § 251.1(c).

38. Notwithstanding these rules and regulations, Freeplay has openly misrepresented to consumers that it offers "FREE MUSIC FOR YOUTUBE," without the requisite "clear and conspicuous" disclosure of the conditions that purportedly must be met for the offer of "free music" to apply.

39. The natural and proximate – and, indeed, deliberate – consequence of Freeplay's misconduct has been the very copyright "infringements" by which Freeplay purports to have been injured. In reality, Freeplay seeks to earn a windfall from these "infringements" through exorbitant settlement and litigation demands.

40. Freeplay has asserted copyright infringement claims in over two dozen actions over the last several years. Upon information and belief, most, if not

|   |   |
|---|---|
| 1 | all, of these litigations resulted in monetary settlements for Freeplay that exceeded |
| 2 | what it could or would have earned in license fees, had the purported terms of |
| 3 | usage been properly disclosed on its website. |
| 4 | 41. Upon information and belief, Freeplay has sent demand letters to |
| 5 | other individuals and entities it never sued, and who entered into monetary |
| 6 | settlements with Freeplay precisely to avoid the litigation that Freeplay threatened, |
| 7 | but that its victims could not afford to defend. |
| 8 | 42. Upon information and belief, Freeplay routinely demands payment of |
| 9 | $30,000 per work in its settlement demands even though the purported |
| 10 | "infringements" were caused by its own false and deceptive advertising, and even |
| 11 | though the cost to license those works from Freeplay for "business use" ($100 to |
| 12 | $250 per work) is orders of magnitude less than the amount of its unconscionable |
| 13 | demands. |
| 14 | 43. As a direct result of Freeplay's false and deceptive representations and |
| 15 | Advertisements, victims of Freeplay's practices have been forced to expend costly |
| 16 | legal fees to defend against Freeplay's predatory litigation efforts, all arising from |
| 17 | the very "infringements" Freeplay has deliberately induced through its false, |
| 18 | deceptive and misleading advertisements and representations. |
| 19 | 44. By the foregoing acts, Freeplay has leveraged and therefore misused |
| 20 | its copyrights, including without limitation the Copyright, to undermine the |
| 21 | Constitution's goal of promoting invention and creative expression.   The creation |
| 22 | of new works, such as YouTube videos, is precisely the sort of creative expression |
| 23 | which the Copyright Act is intended to promote.  By encouraging YouTube users |
| 24 | to download its music for "free," and then issuing litigation threats and monetary |
| 25 | demands to those same YouTube users for purported violations of its License, |
| 26 | Freeplay engages in a pattern which actively undermines the Copyright Act's |
| 27 | public policy of promoting creative expression.  Freeplay's actions discourage |
| 28 | YouTube users from creating further YouTube videos.   Freeplay misuses the |

13

**FIRST AMENDED COMPLAINT**

EXHIBIT G

VOGTS000733

Copyright Act's remedies in order to threaten unsuspecting YouTube users with monetary demands for the maximum statutory damages available under the Copyright Act. Freeplay purposefully misleads YouTube users in order to avail itself of these threats of copyright infringement litigation, as the actual value of its copyrights is quite low.

## FIRST CAUSE OF ACTION

### (**For Declaratory Judgment**)

45. Plaintiffs re-allege herein by this reference each and every allegation contained in paragraphs 1 through 44, inclusive, of this First Amended Complaint as if set forth fully herein.

46. There is an actual and justiciable controversy between Plaintiffs and Defendant in that Defendant claims that Plaintiffs have infringed upon the Copyright by using the material subject to the Copyright in YouTube videos without a paid license. Conversely, Plaintiffs deny Defendant's claims and contend that they have not infringed upon the Copyright.

47. Any prior use of the material subject to the Copyright by Plaintiffs was *de minimis* and, therefore, noninfringing.

48. Plaintiffs' use of the material subject to the Copyright in YouTube videos was primarily for the purposes of criticism, comment, and news reporting.

49. Plaintiffs' use of the material subject to the Copyright in YouTube videos was not substantially commercial.

50. Plaintiffs' use of the material subject to the Copyright in YouTube videos was of a reasonable length to accomplish their goals of criticism, comment, and news reporting.

52. Plaintiffs' use of the material subject to the Copyright in YouTube videos was transformative because such use altered the material subject to the Copyright with new expression, meaning, or message.

|   |   |
|---|---|
| 1 | 53. Plaintiffs' use of the of the material subject to the Copyright in YouTube videos had little to no effect on the potential market for or value of the material subject to the Copyright. |
| 4 | 54. Due to the purpose and nature of Plaintiffs' use of the material subject to the Copyright in YouTube videos, such use should be considered presumptive fair use under 17 U.S.C. § 107. |
| 7 | 55. A judicial declaration of the parties' respective rights and obligations with respect to the Copyright. |
| 9 | 56. Plaintiffs are entitled to a declaratory judgment that: |
| 10 | a.) Plaintiffs have not infringed upon the Copyright by using *de minimis* portions of the material subject to the Copyright in YouTube videos. |
| 12 | b.) Plaintiffs' use of the material subject to the Copyright in YouTube videos is noninfringing fair use. |
| 14 | c.) Defendant's copyright misuse prohibits copyright enforcement by Defendant against Plaintiffs. |

**SECOND CAUSE OF ACTION**

**(For Violation of Unfair Competition Law [California Business & Professions Code § 17200, *et seq.*])**

57. Plaintiffs re-allege herein by this reference each and every allegation contained in paragraphs 1 through 56, inclusive, of this First Amended Complaint as if set forth fully herein.

58. Plaintiffs are informed and believe, and based thereon allege that Defendant has committed and is continuing to commit unfair, unlawful, and fraudulent business practices and acts constituting unfair competition against Plaintiffs as defined by California Business and Professions Code Section 17200, by, among other things, exploiting deceptive business practices through the operation and marketing of its highly interactive website.

59. Plaintiffs are informed and believe, and based thereon allege that, as a direct, proximate, and foreseeable result of Defendant's conduct, as alleged above, Plaintiffs have been deprived of money, property, profits, and other benefits that rightfully belong to Plaintiffs including, without limitation, the advertising proceeds Plaintiffs would otherwise have received from their YouTube channels, but for the conduct of Defendant. Accordingly, Plaintiffs are entitled to restitution of all such money, property, profits, and other benefits.

60. Plaintiffs are informed and believe, and based thereon allege, Defendant's unfair and unlawful acts as described above are a serious and continuing threat to Plaintiffs' reputations, goodwill, and financial health. If Defendant is allowed to continue its wrongful acts, Plaintiffs will suffer further immediate and irreparable injury, loss, and damage. Plaintiffs are further informed and believe, and based thereon allege that, in the absence of a preliminary and permanent injunction as prayed for below, Defendant and its agents will continue to violate Plaintiffs' rights by engaging in the conduct alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant as follows:

**On the First Cause of Action:**

1. A declaration that Plaintiffs' *de minimis* use of the material subject to the Copyright on YouTube does not infringe upon the Copyright;
2. A declaration that Plaintiffs' use of the material subject to the Copyright is protected as fair use;
3. A declaration that Plaintiffs' transformative use of the material subject to the Copyright is presumptively fair use;
4. A declaration that due to Defendant's copyright misuse, it cannot assert an infringement action against Plaintiffs;

16
**FIRST AMENDED COMPLAINT**
EXHIBIT G

VOGTS000736

5. For costs of suit incurred herein;

6. For such other and further relief as the Court may deem just and proper; and

7. For attorneys' fees as may be provided by statute;

**On the Second Cause of Action:**

1. For restitution of all money, property, profits, and other benefits acquired by Defendant by means of its unfair business practices;

2. For a preliminary and permanent injunction enjoining Defendant, and its officers, agents, servants, employees, assigns, representatives, and all those acting in concert or participating with them, from engaging in, committing, or performing, directly or indirectly, unfair competition as defined in California Business and Professions Code Section 17200 *et seq.,* including, but not limited to, the acts and practices alleged in this Complaint;

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court may deem just and proper.

Dated: December 21, 2015　　　　　　　　FREEDMAN + TAITELMAN, LLP

By: /s/ Bryan J. Freedman
Bryan J. Freedman
Sean M. Hardy,
Attorneys for Plaintiffs
Penske Media Corporation
and Variety Media, LLC