| | |
|---|---|
| 1 | Lincoln D. Bandlow (SBN: 170449) |
| | Lincoln@BandlowLaw.com |
| 2 | Rom Bar-Nissim (SBN: 293356) |
| | Rom@BandlowLaw.com |
| 3 | **Law Offices of Lincoln Bandlow, P.C.** |
| | 1801 Century Park East, Suite 2400 |
| 4 | Los Angeles, CA 90067 |
| | Telephone: 310.556.9680 |
| 5 | Facsimile: 310.861.5550 |
| 6 | Attorneys for Defendants |
| | Penske Media Corporation |
| 7 | and Dirt.com, LLC |

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON VOGTS, an individual, | Case No.: 2:22-cv-01153-FWS-PVC |
| Plaintiff, | **THE PMC DEFENDANTS' SUPPLEMENTAL BRIEF PURSUANT TO THIS COURT'S JUNE 9, 2023 ORDER [DKT # 96] AND IN SUPPORT OF THE PMC DEFENDANTS': (1) MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT # 43]; AND (2) CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT # 62]** |
| v. | |
| PENSKE MEDIA CORPORATION, a Delaware Corporation; DIRT.COM, LLC, a Delaware Limited Liability Company; MOVE, INC., a Delaware Corporation, d/b/a Realtor.com; and DOES 1 through 10, | |
| Defendants. | |
| | Assigned to: Hon. Fred W. Slaughter |
| | Date: May 4, 2023 |
| | Time: 10:00 a.m. |
| | Courtroom: 10D |

THE PMC DEFENDANTS' SUPPLEMENTAL BRIEF PURSUANT TO JUNE 9, 2023 ORDER

# TABLE OF CONTENTS

I. UNDER *WARHOL*, THE FIRST FAIR USE FACTOR FAVORS THE PMC DEFENDANTS……………………………………………………..1

II. UNDER *VHTIII*, THE SUBJECT PHOTOGRAPHS CONSTITUTE THREE COMPILATIONS ……...……………………………….…….5

III. CONCLUSION …………………………………………………………10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publishing Co.*,
  747 F.3d 673 (9th Cir. 2014) ................................................................................ 7

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
  143 S.Ct 1258 (2023) ....................................................................................... 1-5

*Sullivan v. Flora, Inc.*,
  63 F.4th 1130 (7th Cir. 2023) ............................................................................... 9

*VHT, Inc. v. Zillow Group, Inc.*,
  -- F4th --, 2023 WL 3857495 (9th Cir. 2023) ............................................... 5-10

*VHT, Inc. v. Zillow Group, Inc.*,
  918 F.3d 723 (9th Cir. 2019) ................................................................................ 6

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
  795 F.3d 1255 (11th Cir. 2015) ............................................................................ 9

**Statutes**

17 U.S.C. § 101 ........................................................................................................ 6

## SUPPLEMENTAL BRIEF

Defendants Penske Media Corporation and Dirt.com, LLC (collectively, the "PMC Defendants") submit their supplemental brief pursuant to the Court's June 9, 2023 Order (Dkt. No. 96) inviting the parties to submit additional briefing on: (1) *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S.Ct. 1258 (2023) ("*Warhol*"); and (2) *VHT, Inc. v. Zillow Group, Inc.*, -- F.4th --, 2023 WL 3857495 (9th Cir. June 7, 2023) ("*VHT III*"). This supplemental brief is made in support of the PMC Defendants': (1) motion for partial summary judgment (Dkt # 43) ("MPSJ"); and (2) motion for summary judgment (Dkt # 62) ("MSJ").

## I. UNDER *WARHOL*, THE FIRST FAIR USE FACTOR FAVORS THE PMC DEFENDANTS

The analysis under the first fair use factor—the purpose and character of the use—as set forth in *Warhol* favors the PMC Defendants. The "only question" before the Supreme Court in *Warhol* was the interpretation and application of the first fair use factor. 143 S.Ct. at 1272-73. The Court explained that this factor focuses on whether "the specific 'use' of a copyrighted work that is alleged to be 'an infringement'" has "a further purpose or different character" than the original use and whether that secondary use has a commercial or other nature. *Id.* at 1273 & 1277. Although the Supreme Court reached the opposite conclusion in *Warhol* (based on its unique facts), this Court should find that the first factor favors the PMC Defendants because they used Vogts' images: (1) for a different purpose than Vogts; and (2) for editorial news reporting as opposed to a traditional commercial use.

The plaintiff in *Warhol*, Lynn Goldsmith, was a successful rock photographer who photographed Prince in 1981 to illustrate an article published in *Newsweek* about the artist. 143 S.Ct. at 1266. A few years later, *Vanity Fair* hired Andy Warhol to create a silkscreen portrait of Prince for that magazine's own article about Prince, and the magazine paid Goldsmith $400 to license one of her photographs for use as an "artist reference" for the Warhol work. *Id.* at 1267. Although the license covered

use of Goldsmith's photograph on a single issue only, Warhol created 16 silkscreens from the photograph. *Id.* at 1267. When Prince died in 2016, Condé Nast published a special issue celebrating his life, which it illustrated with one of those silkscreens. *Id.* at 1266. Condé Nast obtained a license from the Andy Warhol Foundation for the Visual Arts ("AWF") for the publisher's use of the silkscreen but licensed no rights from Goldsmith. *Id.*

The Supreme Court provided a detailed analysis of how the first factor is to be applied and concluded that the factor "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism." *Id.* at 1273. As the Supreme Court explained, secondary uses that are distinct favor a finding of fair use under the first factor because they "serve a manifestly different purpose from the work itself." *Id.* at 1274. As the Court further explained, a secondary "use is distinct from the original, for instance, because the use comments on, criticizes, or ***provides otherwise unavailable information about the original***." *Id.* at 1284 (emphasis added). The Court, moreover, highlighted that "the 'purposes' listed in the preamble of paragraph § 107: '***criticism, comment*** [and] ***news reporting*** … reflect the sorts of copying that courts and Congress ***most commonly have found to be fair uses***." *Id*. at 1274 (emphasis added; brackets omitted). This is because the preamble's "examples are easily understood" and "serve a ***manifestly different purpose*** from the work itself." *Id.* (emphasis added; brackets omitted).

The Supreme Court further explained that "the first factor also relates to the justification for the use" and "a use that has a ***distinct purpose is justified*** because it furthers the goal of copyright" and is "reasonably necessary to achieve the user's new purpose." *Id.* at 1276 (emphasis added). If, however, "an original work and a secondary use share the same or highly similar purposes," the secondary user must provide "some other justification for the copying." *Id.* at 1277.

All of this, which is a matter of degree, must then be balanced against the commercial nature of the use. As the Court explained, the "commercial nature of the use is **not** dispositive." *Id.* at 1276 (emphasis added). Rather, "the first fair use factor considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use." *Id.*

Critically, the Supreme Court clarified that the "fair use provision, and the first factor in particular, requires an analysis of the *specific use* of a copyrighted work that is alleged to be an infringement." *Id.* at 1277 (emphasis added; quotation marks omitted). The Supreme Court emphasized that "specific use" should be identified narrowly. *Id.* at 1279 fn. 11. In *Warhol*, the "particular use at issue" was the use of both works "in a magazine about Prince." *Id.* The Court refused to "define the purpose as simply 'commercial' or 'commercial licensing'" – nor as "fungible products in the magazine market." *Id.* The Supreme Court highlighted this point by noting that "the analysis here might be different if [the Warhol silkscreen] appeared in an art magazine alongside an article about Warhol."[1] *Id.* at 1279 fn. 12.

The Court also clarified the relationship between the first and fourth factors. While factor one focuses on whether "the original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Id.* at 1279 fn. 12. Thus, when the secondary use is "different in purpose and character," it is "less likely to usurp demand for the original work or its derivative." *Id.*

Applying this framework, the Supreme Court found that the first factor did not favor fair use because of the high "degree of similarity between the *specific purposes* of the original work and the secondary use at issue." *Id.* at 1279 fn. 11

---

[1] Another example was Warhol's famous silkscreen of a Campbell Soup can. "The purpose of Campbell's logo is to advertise soup," while Warhol's silkscreen "uses Campbell's copyrighted work for an artistic commentary on consumerism." *Warhol*, 143 S.Ct. at 1281. The Court noted that the "situation might be different if AWF licensed Warhol's Soup Cans to a soup business to serve as its logo." *Id.* at fn. 15.

(emphasis added). Both were "portraits of Prince used in magazines to illustrate stories about Prince" (*id.* at 1278), which the Court emphasized was "the *typical* use made of Goldsmith's photographs" of celebrities. *Id.* at 1266, 1269, 1281 fn. 15 (emphasis added).

Under the Supreme Court's analysis, the first factor favors a finding that the PMC Defendants' use of the Subject Photographs was fair, in that Vogts created these images to depict properties for the purpose of facilitating their sale.[2] In stark contrast, the PMC Defendants used the Subject Photographs for a "***different purpose***"—to provide "***otherwise unavailable information***" in news articles about the property owners by: (1) disseminating and promoting news articles that disclosed the identities of public figures who bought and/or sold the properties in the Subject Photographs; (2) commenting and critiquing the properties in the Subject Photographs; and (3) using the Subject Photographs as a window into the lifestyles of these public figures, including commenting on and critiquing those lifestyles.[3] Indeed, as the PMC Defendants demonstrated in their MSJ and Sur-Reply in support, ***Vogts' own citations emphasize that the PMC Defendants uses of the Subject Photographs were for a distinctly different purpose***. Dkt. No. 62, pp. 15:14-16:2, 18, fns. 3, 5; Dkt. No. 66, pp: 1:11-14, 3:1-4:7, fns. 2-5, 7.[4]

The PMC Defendants' uses of the Subject Photographs are also not "the typical use" of Vogts photographs as a general matter. Indeed, despite being a professional photographer since 2014, Vogts has authorized the (gratis) use of his photographs of properties for news articles (and the syndication of those articles) on

---

[2] Dkt. No. 83, Section I, ¶¶ 116, 119, 123, 126, 130, 136, 140, 142; *see also Id.*, ¶¶ 101-108, 113-115, 117-118, 121-122, 125, 128-129, 132, 138-139

[3] Dkt. No. 83, Section I, ¶¶ 159-160, 163-164, 166-167, 169-170, 173-174, 176-177, 179-181, 184-185, 187-188; *see also Id.*, ¶¶ 143-152, 154-158, 161-162, 171-172, 182-183.

[4] Although the Supreme Court directs that different allegedly infringing uses are to be separately analyzed under the first factor (143 S.Ct. at 1279), each of the PMC Defendants' allegedly infringing uses served the same purpose, which differed from Vogts' purpose.

only two occasions, both of which involved distinctly different scenarios because: (1) the identities of the public figures that owned the properties were disclosed in the real estate listings; (2) this disclosure was part of the listing agent's marketing strategy to sell the properties; and (3) the listing agent wanted media coverage that used Vogts' photographs as part of the marketing strategy to sell the properties. Dkt. No. 83, Section I, ¶¶ 117-118; *see also Id.*, ¶¶ 100-108, 113-115.

Finally, having established that the Subject Photographs and PMC Defendants' specific uses of them did not serve a "substitutable purpose," the "differ[ence] in purpose and character" also demonstrates that the PMC Defendants' uses are "less likely to usurp demand for the [Subject Photographs]" under the fourth fair use factor. *Id*. at 1279 fn. 12. Here, the use of the Subject Photographs to provide commentary on the proverbial "lifestyles of the rich and famous" will do nothing to usurp the demand by real estate agents to retain and pay Vogts to photograph properties to assist in the sale of those properties. Indeed, it is undisputed that Vogts has never made a single penny from licensing his photographs for the very different kind of purpose for which the PMC Defendants used the photographs. *See* Dkt. # 83, section I, ¶¶ 113-118.

In sum, under *Warhol*, the first fair use factor favors the PMC Defendants' "specific uses" of the Subject Photographs because each use involved a "different purpose" and provided "otherwise unavailable information" in a new context.

## II.    UNDER *VHT III*, THE SUBJECT PHOTOGRAPHS CONSTITUTE THREE COMPILATIONS

In *VHT III*, the Ninth Circuit found that the defendant, Zillow, infringed 2,700 of plaintiff VHT's individual images and not VHT's database that contained the 2,700 images. *VHT III*, 2023 WL 3857496, *4. Even though VHT's individual images were registered as part of a single database registration, VHT "marketed and licensed" the images "as separate pictorial works" and not as a single database. Here, Vogts registered, marketed and licensed the Subject Photographs in the exact same

5
THE PMC DEFENDANTS' SUPPLEMENTAL BRIEF PURSUANT TO JUNE 9, 2023 ORDER

1  manner: as three groups on a per-property basis. For that reason, *VHT III* supports a
2  finding that the Subject Photographs constitute three compilations based on Three
3  Properties depicted in the Subject Photographs.
4        As relevant here, Zillow was found liable for infringement for using VHT
5  images on a portion of Zillow's real estate website geared towards home
6  improvement and modeling, called "Digs." *VHT III*, 2023 WL 3857496, *2. The
7  images displayed on Digs were "selected and tagged by Zillow moderators" from
8  54,257 VHT images that were non-infringing and derived from real estate listings
9  elsewhere on the Zillow site, not from any arrangement of the images by ZHT. *VHT,*
10 *Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 730, 734, 748 (9th Cir. 2019) ("*VHT I*").
11       Zillow contended that VHT's photos were a single compilation (and,
12 therefore, entitled to only a single award of statutory damages) because VHT had
13 housed all its photos "in a [single] database" and "the database was registered [with
14 the U.S. Copyright Office] as a [single] compilation." *VHT III*, 2023 WL 8357495,
15 *5. The Ninth Circuit rejected Zillow's argument because "it elevate[d] the form of
16 registration [of the database] above all else" (*id.*) and other factors demonstrated that
17 VHT's photos were not merely "part of a 'compilation'" and were, instead,
18 "'individual photos,'" with their own economic value. *VHT III*, 2023 WL 3857496,
19 *2, 4 ((*quoting VHT I*, 918 F.3d at 748).
20       To begin, the Ninth Circuit reiterated that, while "the independent economic
21 value of the photos 'informs [the] analysis' and the form of registration 'may be
22 considered,' neither factor is dispositive" because "what counts is the statutory
23 definition." *Id.* at *5 (*quoting VHT I*, 918 F.3d at 747-48). The statutory definition of
24 "'compilation' is 'a work formed by the collection and assembling of preexisting
25 materials or of data that are selected, coordinated, or arranged in such a way that the
26 resulting work as a whole constitutes an original work of authorship." *VHT III*, 2023
27 WL 8357496, *5 (*quoting* 17 U.S.C. § 101).
28       The Ninth Circuit first found that VHT's infringed photographs were

properly classified as "individual" images under the statutory definition, not merely as parts of VHT's master database because (1) "the individual infringed photos were not 'in any way selected, coordinated, or arranged [by VHT] to create an original work of authorship'"; (2) "VHT licensed the *individual photos* in the database itself, *not* the database itself"; (3) the "database itself was *not* published."; and (4) Zillow was "*not* selecting [images to use based] on the authorship or arrangement of the photos within the database." *Id.* at *6 (emphasis added). The Ninth Circuit also found that VHT's single database registration resulted in separately registering the individual images within the database. *Id.* at *4.

With respect to economic value, the Ninth Circuit recognized that, even though "VHT stored photos in a database, it marketed and licensed individual photos that existed as separate pictorial works." *Id.* Since "VHT licensed the photos on a per-image or per-property bases, rather than licensing the database itself," each photo was "valuable on its own" because the "value came from each photo's individual content rather than their assembly within the database." *Id.*

As to the form of registration, the Ninth Circuit discussed at length the evolution of the Copyright Office's polices regarding registrations for photographic databases and the impact of *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publishing Co.*, 747 F.3d 673 (9th Cir. 2014) had on those practices. *VHT III*, 2023 WL 8357495, *6-8. The Ninth Circuit found that VHT's database registration could encompass both the database and the individual photos within it. *Id.* at *8. Critically, the Ninth Circuit affirmed the district court's analysis of the registration:

> The district court's careful intertwining of factual and legal analysis supports its conclusion that, in this case, the registration encompassed the individual photos that were infringed. The court considered the appropriated factors and distinguished between "VHT's organization of its images *prior to issuance*" in an automated database and "how VHT's images are organized or arranged *when issued*."

*Id.* at *9 (original emphasis). In other words, the manner in which VHT organized the images in the database for purposes of copyright registration prior to their

exploitation (*i.e.*, "prior to issuance") was not the same as how the VHT exploited (*i.e.*, "issued") the images within the database.

In conclusion, the Ninth Circuit found that the "statutory text, caselaw, and common sense compel one result: the infringed works were not the database but instead were the 2,700 individual photographs, and VHT is entitled to an award for each of the 2,700 infringements." *VHT III*, 2023 WL 3857495, *9.

*VHT III* supports a finding that the Subject Photographs constitute three compilations for the same reasons set forth in the PMC Defendants' MPSJ and Reply Brief in support. Indeed, the prior briefing primarily relied on the district court's decision in the VHT case[5] and the Ninth Circuit "affirm[ed] the district court's decision in full." *VHT III*, 2023 WL 3857495, *2.

*VHT* is readily distinguishable from this case. First, VHT did not market and license its images as part of a single database—the unit of measurement that Zillow wanted the court to adopt. Rather, the Ninth Circuit found that VHT was entitled to 2,700 individual statutory damage awards because VHT marketed and licensed its images on an individual basis. Here, in contrast, Vogts concedes he licensed the Subject Photographs only on a per-property basis—the unit of measurement that the PMC Defendants submit the Court should adopt to determine whether the Subject Photographs comprise three compilations. Dkt. No. 83, Section II, ¶¶ 6-8, 14-16, 22-24. Indeed, unlike VHT (and for the reasons discussed in the Reply Brief to the MPSJ), ***there is no genuine dispute of material fact that Vogts never marketed or attempted to license the Subject Photographs on an individual basis***. Dkt. No. 60, pp. 4:14-5:7; *see also* Dkt. No. 83, Section II, ¶¶ 8, 16, 24, 70-74.

Second, Zillow improperly emphasized the manner of registration (*i.e.*, a single database registration) to argue that VHT's photos were a single compilation. Zillow's argument ignored the fact that VHT marketed and licensed the photos within the database individually and did not market, license or even publish the

---

[5] Dkt. No. 43, pp. 8:3-9:6; Dkt. No. 60, pp. 2:9-3:25 (same)

database as a whole. Here, Vogts registered, marketed, licensed and published the Subject Photographs in the exact same manner: in three groups based entirely on the property depicted in those photographs.[6] Dkt. No. 83, Section II, ¶¶ 2-3, 6-8, 10-11, 14-16, 18-19, 22-24.

Third, Zillow argued that VHT's *entire database* of photos of various properties constituted a *single compilation*. Zillow did not argue that photographs of the same property constituted a compilation. Therefore, the focus of *VHT III* was on whether the database *as a whole* (and not *photographs of the same property*) constituted a compilation. In contrast, the PMC Defendants' argument is one that was not addressed in *VHT III* – *i.e.*, that the Subject Photographs consist of three compilations based on the Three Properties depicted in the Subject Photographs, which is how Vogts organizes the images in his registrations and how he exploits them.

Fourth, in *VHT III*, the registration was for a database of photographs. Here, Vogts' registrations were group registrations for published photographs. Dkt. No. 83, Section II, ¶¶ 27, 37, 47. As the PMC Defendants pointed out in connection with their MPSJ, other cases have found that this form of group registration may support a finding of a compilation. *See* Dkt. # 43-1, pp. 12:16-18:11 and Dkt. # 60, p. 8:19-23 (*citing Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1279-80 (11th Cir. 2015) and Dkt. # 65 (*citing Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1143 (7th Cir. 2023)).

Fifth, Zillow infringed the individual images and not VHT's compilation in the database because: (1) VHT's database was never published; (2) Zillow's moderators chose 2,700 of the 54,257 VHT images based on their own selection of individual rooms depicted in the images and not based on any selection and

---

[6] As the PMC Defendants made clear at the May 4, 2023 hearing, they are ***not*** arguing that all of the photographs registered under a single registration are a single compilation. Rather, each registration has multiple compilations that are based on the property depicted in the registration.

arrangement by VHT; and (3) there was no indication that any of the 2,700 images depicted the same property. Here, Vogts created three compilations of photographs based on the Three Properties to provide holistic views of the homes to facilitate their sale on real estate listings. *See* Fn. 4; Dkt. No. 83, Section II, ¶¶ 1-24. In contrast to Digs, the PMC Defendants followed the same organizational principle used by Vogts; they used part of Vogts' compilations to provide a holistic view into the Three Properties – albeit for the distinctly different purpose of news articles that disclosed the identities of the public figures that bought/sold the Three Properties and to comment and critique on the lifestyles of those public figures. *See* Fn. 3.

In sum, the critical facts that were absent in *VHT III* are present in this case and make clear the Subject Photographs constitute three compilations.

### III. CONCLUSION

For the reasons set forth above, the PMC Defendants respectfully request that this Court grant their MSJ or, in the alternative, their MPSJ.

Dated:  June 23, 2023

**Law Offices of Lincoln Bandlow**

By

LINCOLN D. BANDLOW
ROM BAR-NISSIM
Attorneys for Defendants
Penske Media Corporation and
Dirt.com, LLC